**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| OLD GATE PARTNERS, LLC, | : | |
| Plaintiff, | : | CIVIL CASE NO. |
| | : | 3:18-CV-01657 (JCH) |
| v. | : | |
| | : | |
| PADDOCK ENTERPRISES, LLC, | : | |
| Defendant. | : | MAY 30, 2024 |

**RULING ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. NO. 149) AND MOTIONS TO PRECLUDE (DOC. NOS. 145, 147, & 152)**

## I.    INTRODUCTION

Plaintiff Old Gate Partners, LLC ("Old Gate") brings this action under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 et seq.; the Declaratory Judgment Act, 28 U.S.C. § 2201; section 22a-16 of the Connecticut General Statutes; and Connecticut common law against defendant Paddock Enterprises, LLC ("Paddock"). See Amended Complaint ("Am. Compl."). Old Gate alleges that Paddock is liable for contamination of a property ("the Property") currently owned by Old Gate. See id.

Before the court is the plaintiff's Motion for Partial Summary Judgment, see Plaintiff's Motion for Partial Summary Judgment on Liability ("Pl.'s Summ. J. Mot.") (Doc. No. 149), which Paddock opposes, see Defendant's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Def.'s Summ. J. Opp.") (Doc. No. 159). Old Gate has also filed a Motion to Preclude the testimony of defendant's expert Michael Hedden ("Pl.'s Hedden Preclusion Mot.") (Doc. No. 145) and a Motion to Preclude the testimony of defendant's expert Nicholas Hastings ("Pl.'s Hastings

Preclusion Mot.") (Doc. No. 147).  In turn, Paddock has filed a Motion to Preclude the testimony of plaintiff's expert Adam Henry ("Def.'s Henry Preclusion Mot.") (Doc. No. 152).

For the reasons set forth below, the plaintiff's Motion for Partial Summary Judgment is granted in part and denied in part; the plaintiff's Motion to Preclude the testimony of Michael Hedden is granted in part and denied in part; the plaintiff's Motion to Preclude the testimony of Nicholas Hastings is denied; and the defendant's Motion to Preclude the testimony of Adam Henry is denied.

## II.    BACKGROUND

### A.    Factual Background[1]

On May 15, 2017, Old Gate purchased a property located at 265-269 Old Gate Lane, Milford, Connecticut ("the Property"), which consisted of approximately sixteen acres of land and several vacant buildings, including "a manufacturing building, an office building, and a laboratory/office building."  See Defendant's Local Rule 56(a)2 Statement of Facts ("Def.'s LR 56(a)2 Stmt.") ¶ 1 (Doc. No. 159-1); Plaintiff's Local Rule 56(a)1 Statement of Facts ("Pl.'s LR 56(a)1 Stmt.") ¶ 1 (Doc. No. 149-1).

#### 1.    Overview of Operations and Contamination of the Property

From 1966 to 1976, the Property was operated by Aerosol Techniques, Inc. ("ATI") to, inter alia, formulate and package mixtures in aerosol cans, including pesticides, room deodorants, household cleaners, and hair sprays.  See Def.'s LR 56(a)2 Stmt. ¶ 2; Pl.'s LR 56(a)1 Stmt. ¶ 2.  "ATI ceased manufacturing operations in

---

[1] The court draws primarily from the parties' Local Rule 56(a) Statements and supporting Exhibits in summarizing the material facts.  As it must, the court construes all disputed facts in the light most favorable to Paddock, the nonmoving party.  Unless otherwise noted, the facts are undisputed.

1976, but continued occupying the laboratory building until 1985." See Def.'s LR 56(a)2 Stmt. ¶ 2; Pl.'s LR 56(a)1 Stmt. ¶ 2. Paddock's successor-in-interest, Owens-Gate Illinois ("O-I"), began its operations at the Property in 1976 and ceased in 1987, though it continued as a tenant at the Property until 1989. Def.'s LR 56(a)2 Stmt. ¶ 3; Pl.'s LR 56(a)1 Stmt. ¶ 3; Form III, Def.'s Ex. 1, at 2 (Doc. No. 159-2); September 18, 1989 Owens-Gate Intra-Company Memorandum, Pl.'s Ex. C (Doc. No. 149-4). At the Property, O-I manufactured two-liter plastic bottles, which are commonly used for soft drinks. Def.'s LR 56(a)2 Stmt. ¶ 4; Pl.'s LR 56(a)1 Stmt. ¶ 4.

According to testimony from John Johnson ("Johnson"), who worked at O-I's facility at the Property from 1981 through 1987 and served as the facility's Plant Manager, O-I used, inter alia, hydraulic oil, motor oil, 1,1,1-Trichloroethane ("TCA"), No. 2 fuel oil, and Safety-Kleen/mineral spirits.[2] Def.'s LR 56(a)2 Stmt. ¶ 6; Pl.'s LR 56(a)1 Stmt. ¶ 6. O-I used approximately 20 plastic injection machines, each of which used about 650-800 gallons of hydraulic oil at a time, and it would order 5,000 gallons of hydraulic oil at a time. Def.'s LR 56(a)2 Stmt. ¶¶ 7-8; Pl.'s LR 56(a)1 Stmt. ¶¶ 7-8. O-I also utilized "two 1,000 gallon above-ground storage tanks ("ASTs") to store waste hydraulic oil from the injection machines and waste oil from the forklifts, the latter of which used about [four] quarts at a time." Def.'s LR 56(a)2 Stmt. ¶ 9; Pl.'s LR 56(a)1 Stmt. ¶ 9. The hydraulic oil was periodically changed using a mobile transfer pump, which manually transferred the waste oil into a 1,000-gallon waste oil AST that was

---

[2] Old Gate also asserts that O-I used freon at the Property, see Pl.'s LR 56(a)1 Stmt. ¶ 6, which Paddock denies on the grounds that freon "was present only in a closed-loop system in water chillers located inside the warehouse building and was not part of Paddock's operations", see Def.'s LR 56(a)2 Stmt. ¶ 6.

located outside the Property's warehouse building.  Def.'s LR 56(a)2 Stmt. ¶ 11; Pl.'s LR 56(a)1 Stmt. ¶ 11.

According to Johnson, it was "very common" for Old Gate to spill waste oil while filling or emptying the hydraulic oil in the injunction machines, but O-I responded to spills promptly and "[v]ery carefully, with strict procedures for cleanup."  July 29, 2019 Transcript of Deposition of John R. Johnson ("Pl.'s Johnson Dep. Tr."), Pl.'s Ex. 2, at 59:7-60:6 (Doc. No. 149-3).  He has also attested that "[d]rums containing oil-soaked sawdust and rags used to clean up spills of hydraulic oil were stored outside the Warehouse Building and the asphalt in that area looked stained", and that "the ground where the above-ground waste oil storage tanks were located" appeared "weathered." Def.'s LR 56(a)2 Stmt. ¶¶ 13-14; Pl.'s LR 56(a)1 Stmt. ¶¶ 13-14.  In addition, Johnson testified that, "between the building, the asphalt, and the railroad tracks, there was a collection . . . [t]here was a stormwater discharge."  Pl.'s Johnson Dep. Tr. at 170:25-171:15.  Oil contamination was ultimately found at the Property in the vicinity of where O-I transferred and stored its waste oil and where stained gravel and asphalt were observed.[3]  See Def.'s LR 56(a)2 Stmt. ¶ 16; Pl.'s LR 56(a)1 Stmt. ¶ 16.

---

[3] Here, Paddock admits that "petroleum contamination was detected at the Property," but it denies that the contamination "occurred during, or was caused by," O-I's operations.  Def.'s LR 56(a)2 Stmt. ¶ 16.  However, Old Gate's Statement of Fact merely posits that oil contamination was found at the Property around where O-I stored its waste oil and where the spills were observed; it says nothing about timing or causation.  Accordingly, Old Gate's Statement of Fact is deemed admitted.

Indeed, the court notes that Paddock proffers this form of response, i.e., admitting to usage and contamination of substances but denying that any contamination "occurred during, or was caused by, Paddock's operations", throughout its Local Rule 56(a)2 Statement.  See Def.'s LR 56(a)2 Stmt. ¶¶ 17, 18, 25, 28, 31, 32, 33, 35, 36, 37, 39, 40, 42, 43, 44, 45, 54.  As such, the court applies the above analysis to these Statements of Fact as well, and—unless otherwise noted—they are deemed admitted.

O-I also used Safety Kleen/mineral spirits and TCA, the latter of which was "dispensed through an interior spigot" and "stored in a 500 gallon AST that was located outside of the Warehouse Building."  Def.'s LR 56(a)2 Stmt. ¶¶ 17-18; Pl.'s LR 56(a)1 Stmt. ¶¶ 17-18.  TCA contamination was detected at the Property.  See Def.'s LR 56(a)2 Stmt. ¶ 22; Pl.'s LR 56(a)1 Stmt. ¶ 22.  In addition, according to Johnson, O-I used Freon in water chillers in the warehouse building, which was handled by an outside contractor.  See Pl.'s Johnson Dep. Tr. at 73:7-73:19; Def.'s LR 56(a)2 Stmt. ¶¶ 23-24; Pl.'s LR 56(a)1 Stmt. ¶¶ 23-24.  Freon contamination was similarly detected at the Property.  See Def.'s LR 56(a)2 Stmt. ¶ 25; Pl.'s LR 56(a)1 Stmt. ¶ 25.  O-I also used pesticides and algicides[4] at the Property.  See Def.'s LR 56(a)2 Stmt. ¶¶ 26-27; Pl.'s LR 56(a)1 Stmt. ¶¶ 26-27.  In turn, "[p]esticide contamination in the form of chlordane" and "[a]rsenic contamination above background levels" were also found at the Property.  Def.'s LR 56(a)2 Stmt. ¶ 28; Pl.'s LR 56(a)1 Stmt. ¶ 28.  However, Johnson has also testified that, during O-I's operations at the Property, TCA, freon, and Safety Kleen were carefully contained and that he does not recall spills or leaks of these substances.  See Pl.'s Johnson Dep. Tr. at 72:5-73:23, 108:6-110:8, 110:9-114:16.

      2.     Environmental Site Observations and Reports Regarding the Contamination at the Property

On July 17, 1984, a representative of the Connecticut Department of Environmental Protection ("DEEP") visited the Property and observed on the site "50

---

[4] In its Statement of Fact, Old Gate also notes that algicides "are a source of arsenic," see Pl.'s LR 56(a)1 Stmt. ¶ 27, but Paddock denies that there is any evidence that "arsenic was present in the algicide Paddock used" and it notes that Adam Henry ("Henry"), Old Gate's expert, "does not know whether any algicides used by Paddock actually contained arsenic", see Def.'s LR 56(a)1 Stmt. ¶ 27 (citing September 25, 2023 Transcript of Deposition of Adam Henry, Def.'s Ex. 8, at 477:17-479:5 (Doc. No. 159-9)).

drums of waste oil and empty drums stored on gravel, heavily stained"; "gravel adjacent to the above-ground waste oil tanks" which was "also stained"; and "[s]pillage and/or leakage" under the "waste oil storage area." See July 17, 1984 DEEP Report ("1984 DEEP Report"), Pl.'s Ex. K (Doc. No. 149-12).

Over one year later, on February 20, 1986, HRP, an environmental consulting firm, visited and inspected the Property and observed that "gravel along the northern corner of the retention basin is discolored due to oil staining" and that "asphalt surrounding the aboveground waste oil tanks is stained due to waste oil spills." See February 20, 1986 HRP Report ("HRP Report"), Pl.'s Ex. L, at 15-16 (Doc. No. 149-13); Def.'s LR 56(a)2 Stmt. ¶¶ 31-32; Pl.'s LR 56(a)1 Stmt. ¶¶ 31-32. The HRP Report also noted, inter alia, "oil staining and heavily oil contaminated ground in the rear of the main building around the waste oil tank" and that O-I's underground storage tanks ('USTs") "are five years beyond the maximum average life expectancy for underground steel tanks" and therefore "may be unsound." HRP Report at 17. Notably, these USTs "were later tested and found to be leaking at a rate of approximately a half gallon per hour or 10 gallons per day in September of 1987, at the time that [O-I] was selling its Milford business to a competitor known as Sewell Plastics."[5] Def.'s LR 56(a)2 Stmt. ¶ 36; Pl.'s LR 56(a)1 Stmt. ¶ 36. The HRP Report concluded that "[p]ast and present oil contamination of the soil is an area of concern at the Owens-Illinois facility." HRP Report at 17.

---

[5] Although Paddock admits this Statement of Fact, it notes that Johnson testified that it was Sewell Plastics' pressure testing in September 1987 that caused the underground storage tanks to leak. See Def.'s LR 56(a)2 Stmt. ¶ 36 (citing Pl.'s Johnson Dep. Tr. at 130:6-130:25).

On May 28, 1987, Camp Dresser & McKee ("CDM"), an environmental consulting firm retained by Paddock, performed an environmental assessment on the Property.  See Def.'s LR 56(a)2 Stmt. ¶ 39; Pl.'s LR 56(a)1 Stmt. ¶ 39.  The CDM Report observed:

> Surface oil accumulation was noted in the . . . steam-cleaning area and in the vicinity of the nearby above ground waste oil tank.  There is no containment offered for steam cleaning wastes, which have accumulated on the pavement. The manual emptying of waste oil cans into the waste oil tank appears to be responsible for minor spillages in that location . . . .  Surface water runoff in this area enters the retention pond south of the facility, via storm drains, and also enters a storm sewer to the east . . . .

1987 CDM Report ("CDM Report"), Pl.'s Ex. M, at 4 (Doc. No. 149-14).  The Report further found that "[a]n oily sheen . . . at the inlet to the pond[,] apparently originating from surface oils in the vicinity of the steam-cleaning pad, waste oil tank and hydraulic oil pipes".  Id. at 5.  However, the Report also concluded that "there have been no releases of hazardous substances on the site" and "there is no apparent potential for significant releases of hazardous substances to the environment."  Id. at 6.

On February 17, 1989, DAY Engineering ("DAY"), another environmental consulting firm retained by Paddock, released a Soil & Groundwater Contamination Study.  See Def.'s LR 56(a)2 Stmt. ¶ 41; Pl.'s LR 56(a)1 Stmt. ¶ 41.  The DAY Report noted that "[s]pills of volatile hydrocarbon materials have accumulated in the soil in at least two areas", and it also observed that "hydrocarbons are abundant in the south end of the drain pipe bedding, as witnessed by the thick gooey nature of the material found in the pipe and in the soil at the bottom of the excavation."  February 17, 1989 DAY Report ("DAY Report"), Pl.'s Ex. N, at 23 (Doc. No. 149-15).  The Report also "identified the following hazardous substances (caused by industrial solvents) in the soil, soil vapor and groundwater on the Property: petroleum hydrocarbons, Freon, and the solvents

TCA and PCE, related to the leaks from the drainage pipes." Def.'s LR 56(a)2 Stmt.
¶ 44; Pl.'s LR 56(a)1 Stmt. ¶ 44; accord DAY Report at 2, 3, 4, 14, 19-21. Notably, the
Report also found "very strong evidence to support the conclusion that the
contamination originated" during ATI's tenure. DAY Report at 30.

On October 3, 1990, Enviro-Sciences, Inc. ("ESI") submitted a Site Investigation
Report, which was commissioned by the Property's then-current owner, MCA, where it
identified "TCA, PCE, TCF and related chlorinated solvents" as "major contaminants" on
the Property. Def.'s LR 56(a)2 Stmt. ¶ 45; Pl.'s LR 56(a)1 Stmt. ¶ 45; accord ESI Site
Investigation Report ("ESI Report"), Pl.'s Ex. O, at 6 (Doc. No. 149-16) (listing the major
contaminants detected). The ESI Report noted that the warehouse building where O-I
operated contained "a series of floor trenches in the interior", each of which "was
equipped with a sump pump to remove infiltrating groundwater and accumulated
hydraulic oil from the plastic molding machines which O-I utilized on the site." ESI
Report at 4. The Report also found TCA and PCE present in a sample and stated that
the presence of these substances was caused by O-I's activities during the period in
which it was operating on the Property.[6] See Def.'s LR 56(a)2 Stmt. ¶ 47; Pl.'s LR
56(a)1 Stmt. ¶ 47; ESI Report at 7-9. In addition, the Report stated that "[t]here is clear
evidence that there were discharges of waste oils to the site during O-I's occupancy";
that "the waste oil was contaminated with [TCA]"; and that "[t]here can be no doubt that
O-I, and O-I alone, is responsible for the [TCA] contamination of the soil and

---

[6] Paddock "admits the ESI report states this information, but denies its truth" because "other evidence indicates that ATI, not Paddock, is responsible for the contamination at the Property." Def.'s LR 56(a)2 Stmt. ¶ 47. Paddock provides the same response to Old Gate's other Statements of Fact that quote directly from the ESI Report. See id. at ¶¶ 48-50.

groundwater at the site." ESI Report at 8. Finally, the ESI Report concluded, inter alia, that (1) O-I "substantially caused all of the contamination on the site[,] [s]pecifically . . . contamination by the oil, [TCA] and PCE." Id. at 10.

On June 25, 1994, DEEP released a Preliminary Assessment Report on the Property. See Def.'s LR 56(a)2 Stmt. ¶ 51; Pl.'s LR 56(a)1 Stmt. ¶ 51. The Report stated that "[t]here are several documented problems with ATI discharging wastes into city sanitary sewers and into adjacent wetlands" and, as such, it "is difficult to evaluate the impacts ATI has had on site contamination." See June 25, 1994 DEEP Report ("1994 DEEP Report"), Pl.'s Ex. P, at 28 (Doc. No. 149-17). DEEP also noted, however, that "[t]here is extensive documentation of spillage of oils and solvents associated with [O-I]'s operations"; that "[O-I] acquired the services of consulting engineers to assess the extent of contamination at the facility site"; and that "[h]igh levels [sic] solvents and petroleum products (and by-products) were discovered in the soils and groundwater on-site."[7] Id. The DEEP Report further noted that, while "[O-I] denies the contamination is a result of their doings on the site", it nonetheless ordered its consultant, DAY Engineering, to formulate a remediation plan. Id. In addition, according to the Report, DEEP also previously directed O-I to remove (1) two 10,000-gallon fuel oil USTs; (2) one 10,000-gallon hydraulic oil UST; and (3) two 25,000-gallon USTs. See Def.'s LR 56(a)2 Stmt. ¶¶ 37-38; Pl.'s LR 56(a)1 Stmt. ¶¶ 37-38; 1994 DEEP Report at 13. O-I removed the two 10,000-gallon fuel oil USTs and the hydraulic

---

[7] As with the ESI Report, Paddock admits that the DEEP Report contained these assertions but denies that the referenced contamination was caused by or associated with O-I's activities on the ground that the contamination occurred during, and because of, ATI's operations, before O-I began operating at the Property. See Def.'s LR 56(a)2 Stmt. ¶ 51.

oil UST, but it did not remove the two 25,000-gallon USTs.  See Def.'s LR 56(a)2 Stmt. ¶¶ 37-38; Pl.'s LR 56(a)1 Stmt. ¶¶ 37-38.

    3.  Environmental Work and Costs

  In 2016, Old Gate "applied for admission into the Connecticut Abandoned Brownfield Cleanup ("ABC") program and was notified by DEEP that the Property was accepted."  Def.'s LR 56(a)2 Stmt. ¶ 58; Pl.'s LR 56(a)1 Stmt. ¶ 58.  On September 25, 2017, after acquiring the Property, Old Gate "submitted an Environmental Condition Assessment Form to DEEP to conduct voluntary remediation of the Property."  Def.'s LR 56(a)2 Stmt. ¶ 59; Pl.'s LR 56(a)1 Stmt. ¶ 59.  Old Gate prepared a Remedial Action Plan ("RAP") for the Property in December 2017, which it publicly noticed in December 2017 and January 2022.  See Def.'s LR 56(a)2 Stmt. ¶¶ 60-61; Pl.'s LR 56(a)1 Stmt. ¶¶ 60-61.  It does not appear that Old Gate has fully implemented the RAP.  See Def.'s LR 56(a)2 Stmt. ¶ 60; accord Transcript of Deposition Joseph Rutigliano ("Pl.'s Rutigliano Dep. Tr."), at 123:9-123:13 (Doc. No. 149-18) (testifying that "while this [current action] is open, [he] [is] not going to take any more people and spend any more dollars going down the line of marketing, cleaning or doing anything until [he] know[s] the outcome").

  Old Gate retained GZA Environmental, Inc. ("GZA") to (1) perform Phase I, II, and III environmental assessments of the Property; (2) prepare and submit an Environmental Condition Assessment Form and RAP; and (3) "supervise removal of a 125-gallon fuel oil UST and a 6,500-gallon dyke-style AST from the Property on June 11, 2021 and conduct related testing."  Def.'s LR 56(a)2 Stmt. ¶ 63; Pl.'s LR 56(a)1 Stmt. ¶ 63.  Joseph Rutigliano, the sole member of Old Gate, has testified that he

removed the 6,500-gallon AST because it was deteriorating and he believed a leak was imminent.  See Pl.'s Rutigliano Dep. Tr. at 127:22-128:3, 134:5-135:2.  "A portion of GZA's Phase II/III charges involved remediation of arsenic contamination at the Property that was above the background threshold."  Def.'s LR 56(a)2 Stmt. ¶ 65; Pl.'s LR 56(a)1 Stmt. ¶ 65.  GZA has issued multiple invoices for its environmental investigatory work at the Property, and these invoices—along with the related proposals and reports—were addressed to "Joseph Rutigliano" and "Old Gate Partners, LLC".  See Ruling on Defendant's Motion for Partial Summary Judgment ("Ruling on Def.'s Summ. J. Mot."), at 3 (Doc. No. 167).

B.    Procedural Background

On October 4, 2018, Old Gate filed its original Complaint against the defendant, Owens-Illinois.  See Complaint (Doc. No. 1).  Old Gate filed an Amended Complaint, with the defendant's consent, on July 29, 2019.  See Am Compl.  Count One of the Amended Complaint asserts that the defendant is liable for Old Gate's response costs incurred under CERCLA.  See id. at ¶¶ 13-22.  Count Two seeks a declaratory judgment, pursuant to the CERCLA claim, that the defendant is liable to plaintiff "for investigation, removal, remediation and any other response costs . . . with respect to past expenditures and also future expenditures."  Id. at ¶¶ 23-28.  Count Three alleges violation of section 22a-16 of the Connecticut General Statutes.  See id. at ¶¶ 29-33.  Count Four seeks reimbursement for costs expended under section 22a-452 of the Connecticut General Statutes.  See id. at ¶¶ 34-41.

On August 12, 2019, the defendant filed its Answer to plaintiff's Amended Complaint, along with its affirmative defenses and counterclaims.  See Answer.  The

defendant's first counterclaim alleged that, to the extent it is found liable to plaintiff, it is "entitled to contribution from Plaintiff" under section 113(f) of CERCLA, see id. at ¶¶ 27-34, while the second counterclaim asserts that defendant is also entitled to a declaratory judgment setting forth "[defendant] and [p]laintiff's respective shares, if any, for response costs incurred and to be incurred at the Property", see id. at ¶¶ 35-37.

On January 7, 2020, Paddock, in its capacity as O-I's "successor by merger", filed a notice of defendant's pending bankruptcy petition with the court, see Suggestion of Bankruptcy (Doc. No. 71), and the case was stayed and administratively closed, see Order Staying the Case (Doc. No. 74). On July 18, 2022, Paddock moved to reopen the case and to substitute itself for O-I as the defendant in this matter. See Motion to Reopen Case. The case was then transferred to the undersigned, who granted the Motion to Reopen on September 30, 2022. See Order (Doc. No. 80).

On April 11, 2023, Paddock filed its Motion for Partial Summary Judgment, see Defendant's Motion for Partial Summary Judgment (Doc. No. 93), which this court denied, see Ruling on Def.'s Summ. J. Mot.

On November 29, 2023, Old Gate filed its Motion for Partial Summary Judgment, see Pl.'s Summ. J. Mot., which Paddock opposes, see Def.'s Summ. J. Opp. That same day, Old Gate filed its Motions to Preclude the testimony of Michael Hedden and Nicholas Hastings ("Hastings"). See Pl.'s Hastings Preclusion Mot.; Pl.'s Hedden Preclusion Mot. Paddock opposes both Motions to Preclude. See Defendant's Memorandum in Opposition to Plaintiff's Motion to Exclude Expert Testimony of Nicholas Hastings ("Def.'s Hastings Preclusion Opp.") (Doc. No. 155); Defendant's Memorandum in Opposition to Plaintiff's Motion to Exclude Expert Testimony of Michael

Hedden ("Def.'s Hedden Preclusion Opp.") (Doc. No. 157).  On December 20, 2023,

Paddock filed its Motion to Preclude the testimony of Adam Henry ("Henry"), <u>see</u> Def.'s

Henry Preclusion Mot., which Old Gate opposes, <u>see</u> Plaintiff's Memorandum in

Opposition to Defendant's Motion to Preclude Expert Opinions and Testimony of Adam

Henry ("Def.'s Henry Preclusion Opp.") (Doc. No. 163).

## III.    LEGAL STANDARD

### A.    <u>Motion to Preclude</u>

Expert testimony is admissible under Rule 702 of the Federal Rules of Evidence,

which provides in full:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if: (a) the expert's
> scientific, technical, or other specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in issue; (b) the testimony is
> based on sufficient facts or data; (c) the testimony is the product of reliable
> principles and methods; and (d) the expert has reliably applied the principles and
> methods to the facts of the case.

Fed. Rules of Evid. 702.  The district court acts as a gatekeeper, charged with the task

of deciding whether the expert's testimony satisfies Rule 702's general requirements.

<u>See</u> <u>Daubert v. Merrell Dow Pharms.</u>, 509 U.S. 579, 113 (1993).  The Second Circuit

has emphasized that expert testimony should only be excluded if it is "speculative or

conjectural", if it is "based on assumptions that are 'so unrealistic and contradictory as

to suggest bad faith,' or to be in essence an 'apples to oranges comparison.'"  <u>Boucher

v. U.S. Suzuki Motor Corp.</u>, 73 F.3d 18, 21 (2d Cir. 1996) (quoting <u>Shatkin v. McDonnel

Douglas Corp.</u>, 727 F.2d 202, 208 (2d Cir. 1984)).

In defining the gatekeeping role of the district court, the Second Circuit has

distilled Rule 702's requirements into three broad criteria: (1) qualifications, (2)

reliability, and (3) relevance and assistance to the trier of fact.  See Nimely v. City of New York, 414 F.3d 381, 396-97 (2d Cir. 2005).

       1.     Qualifications

Whether the witness is "qualified by knowledge, skill, experience, training, or education to render his or her opinions as an expert" is a "threshold matter" that courts consider before analyzing the relevance and reliability of the testimony itself.  Vale v. United States of Am., 673 F. App'x 114, 116 (2d Cir. 2016) (summary opinion) (citing Nimely, 414 F.3d at 396 n.11).  A witness is qualified where he or she has "superior knowledge, education, experience, or skill with the subject matter of the proffered testimony."  United States v. Tin Yat Chin, 371 F.3d 31, 40 (2d Cir. 2004). However, the Second Circuit has indicated that an expert's knowledge need not be perfectly tailored to the facts of the case.  See Stagl v. Delta Air Lines, Inc., 117 F.3d 76, 81-82 (2d Cir. 1997).  "If an expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent."  Tardiff v. City of New York, 344 F. Supp. 3d 579, 598 (S.D.N.Y. 2018).

       2.     Reliability

If an expert meets the threshold requirement of qualification, the court must determine whether the expert's testimony itself is reliable.  In Daubert, the Supreme Court identified several factors that may be considered in assessing reliability:

> (1) whether a theory or technique "can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) a technique's "known or potential rate of error," and "the existence and maintenance of standards controlling the technique's operation'" and (4) whether

a particular technique or theory has gained "general acceptance" in the relevant scientific community.

Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002) (quoting Daubert, 509 U.S. at 593–94 (internal quotations and citations omitted)).  These factors, however, do not constitute a "definitive checklist or test."  Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 150 (1999).  Instead, the inquiry is a flexible one and must be "tied to the facts of a particular case" with attention to "the nature of the issue, the expert's particular expertise, and the subject of his testimony."  Id.; see also Nicholas v. Bratton, 376 F. Supp. 3d 232, 290 (S.D.N.Y. 2019) (stating that "[w]here a proposed expert witness bases his testimony on practical experience rather than scientific analysis, . . . courts recognize that [e]xperts of all kinds tie observations to conclusions through . . . general truths derived from . . . specialized experience" (internal quotation marks and citations omitted)).

In assessing reliability, "[t]he district court is not charged with weighing the correctness of an expert's testimony, nor must the court choose between the testimony of competing expert witnesses."  Royal Ins. Co. of Am. v. Joseph Daniel Const. Inc., 208 F. Supp. 2d 423, 426 (S.D.N.Y. 2002) (citing Travelers Prop. & Cas. Corp. v. Gen. Elec. Co., 150 F. Supp. 2d 360, 362 (D. Conn. 2001)).  Rather, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  Daubert, 509 U.S. at 596.

### 3.    Relevance

In addition to ensuring that expert testimony is reliable, the court must decide whether the expert's testimony is relevant, i.e., whether it will "help the trier of fact."  In

re Mirena IUD Prod. Liab. Litig., 169 F. Supp. 3d 396, 413 (S.D.N.Y. 2016).  Like other forms of evidence, expert testimony is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.

However, expert testimony that "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it", United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991), does not aid the jury in making a decision.  In re Mirena IUD Prod. Liab. Litig., 169 F. Supp. 3d at 413.  Accordingly, this court permits experts to state opinions, not legal conclusions.  See Bilzerian, 926 F.2d at 1294 (holding that, while an expert "may opine on an issue of fact within the jury's province", he "may not give testimony stating ultimate legal conclusions based on those facts"); see also Snyder v. Wells Fargo Bank, N.A., 594 F. App'x 710, 714 (2d Cir. 2014) (same).

"Once the thresholds of reliability and relevance are met, the testimony is admissible.  Thereafter, any purported weakness in an expert's methodology or conclusion goes to the degree of credibility to be accorded to the evidence, not to the question of its admissibility."  Royal Ins. Co. of Am., 208 F. Supp. 2d at 426 (citing Ambrosini v. Labarraque, 101 F.3d 129, 133-35 (D.C. Cir. 1996)).

      B.    Motion for Summary Judgment

A motion for summary judgment may be granted only when the moving party can establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wright v. N.Y. State Dep't of Corr., 831 F.3d 64,

71-72 (2d Cir. 2016).  If the moving party satisfies this burden, the nonmoving party must set forth specific facts demonstrating that there is indeed "a genuine issue for trial."  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  A genuine issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Cross Commerce Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016).  Unsupported allegations do not create a material issue of fact and cannot overcome a properly supported motion for summary judgment.  See Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).  In assessing the record to determine whether there are disputed issues of material fact, the trial court must "resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought."  LaFond v. Gen. Physics Servs. Corp., 50 F.3d 165, 175 (2d Cir. 1995).

## IV.    DISCUSSION

### A.    Motions to Preclude

#### 1.    Michael Hedden

Old Gate moves to exclude the testimony of Paddock's valuation expert, Michael Hedden ("Hedden"), on the ground that Hedden is unqualified, that his analysis is unreliable, and that certain opinions that he has proffered are irrelevant.  See Plaintiff's Memorandum of Law in Support of Motion to Exclude Expert Testimony of Michael Hedden ("Pl.'s Hedden Preclusion Mem."), at 3 (Doc. No. 146).

##### a)    Qualifications

Old Gate asserts that Hedden is "not qualified to act as an expert witness with respect to valuing properties in Connecticut" because (1) he lacks sufficient experience

with Connecticut appraisals, (2) his Report contains a significant number of errors, and (3) he fails to consider contradictory or alternative factors. See id.

A witness is qualified where he or she has "superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." Tin Yat Chin, 371 F.3d at 40. Here, Hedden meets that threshold. Hedden has been a real estate appraiser for 42 years, and by his estimate, "[o]ver the course of [his] career," he has conducted or supervised "at least 400 residential appraisals, 3,000 commercial/industrial appraisals, 400 land appraisals, and 300 appraisal reviews." See Expert Report of Michael Hedden ("Hedden Report"), Pl.'s Ex. A, at 3-5 (Doc. No. 146-1). This includes prior experience appraising properties in Connecticut. Although Old Gate is correct that Hedden lacks a permanent Connecticut appraiser license and that his experience appraising properties in Connecticut has been limited, these limits do not warrant outright exclusion of his testimony. "The fact that a witness's qualifications are not unassailable does not mean the witness is incompetent to testify[.]" Valentin v. N.Y. City, No. 94-CV-3911, 1997 WL 33323099, at *15 (E.D.N.Y. Sept. 9, 1997). Because Hedden is qualified in the field of real estate appraisals, Hedden's otherwise limited experience with Connecticut appraisals goes to the weight, not the admissibility, of his testimony.

Old Gate's other arguments, i.e., that Hedden's Report contains errors and that he failed consider important factors, appear to relate to the reliability of his testimony, rather than his qualifications to serve as an expert. Indeed, the court does not view the purported errors as impinging on his qualifications to offer a valuation report.

Accordingly, the court cannot deem Hedden unqualified on those grounds.  The court

therefore concludes that Hedden is qualified.

b)    Reliability

The bulk of Old Gate's Memorandum seeks to exclude Hedden's Report and

testimony on the ground that his analysis is unreliable.  "[W]hen an expert opinion is

based on data, a methodology, or studies that are simply inadequate to support the

conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable

opinion testimony."  Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 266 (2d

Cir. 2002).  Old Gate has proffered multiple reasons as to why Hedden's analysis is

inadmissible, arguing that:

> [Hedden] (i) made a veritable comedy of errors[8] in preparing his Report; (ii) relied
> upon insufficient facts, unknown facts, unverified and assumed facts, and outright
> incorrect facts; and (iii) utilized disjointed analyses and methodologies that were
> unexplained, not capable of being replicated with the information he provided,
> based on subjective, unsupported rationales, and inconsistent and self-
> contradictory.

See Pl.'s Hedden Preclusion Mem. at 3.

(1)    Summary of Hedden's Methodology

In assessing reliability, courts may consider, inter alia, whether a particular

technique has been tested and subject to peer review, whether that technique's

operation is controlled by clear and manageable standards, and whether that technique

is generally accepted in the relevant expert community.  See Amorgianos, 303 F.3d at

265.  In reaching his conclusions, Hedden first determined the Property's "highest and

best use", which is the "[t]he reasonably probable use of property that results in the

---

[8] The court notes that it finds some of the language used by Old Gate to be needlessly pejorative
and unhelpful.

highest value and represents the use of an asset that maximizes productivity and determined that the Property's highest and best use was industrial/commercial use."[9] See Hedden Report at 19-20; accord Steffy v. Home Depot, Inc., No. 06-CV-02227, 2008 WL 5189505, at *7 (M.D. Pa. Dec. 10, 2008) (defining "highest and best use").

Following this determination, Hedden assessed the Property's market value by utilizing an appraisal technique, the sales comparison approach, that is well-accepted and commonly used by appraisers. See Hedden Report at 21 (describing how, to implement the sales comparison approach, "data on sales of similar parcels of land is collected, analyzed, compared, and adjusted to provide a value indication for the site being appraised" (citing The Appraisal of Real Estate 339 (Appraisal Inst., 15th ed. 2020))); Gordon v. New England Cent. R.R., No. 2:17-CV-00154, 2019 WL 4069389, at *5 (D. Vt. Aug. 27, 2019) (noting that the sales comparison approach is "a recognized methodology . . . in offering an appraisal"). Based on this approach, Hedden concluded, inter alia, that the Property's market value was approximately $9 million as of May 2017 and approximately $10.37 million as of April 2023. See Hedden Report at 7-8. Hedden also concluded that Old Gate will obtain significant entrepreneurial profit once it sells the Property. Id. at 8.

(2)    Reliability of Valuation Opinions

Although Old Gate does not contest that the sales comparison approach is a well-accepted appraisal technique, it contends that Hedden's underlying analysis suffers from several flaws that render his valuation opinions inadmissible.

---

[9] Old Gate does not appear to contest the reliability of Hedden's "highest and best use" analysis.

First, as noted above, Old Gate contends that Hedden's testimony should be excluded because it contains multiple errors.  However, "errors or omissions" in a report generally go to weight, rather than admissibility.  See Encompass Advisors, Ltd. v. Unapen, Inc., No. 09-CV-1949, 2013 WL 6331157, at *3 (D. Conn. Dec. 5, 2013). Having reviewed the errors cited by Old Gate—including, inter alia, mistakes or gaps in his valuation spreadsheets—the court does not view these errors as sufficient to render Hedden's Report unreliable and therefore inadmissible.  Rather, Hedden's errors can, and should, be addressed through cross examination.

Old Gate also argues that Hedden disregarded relevant information—including information that contradicted his opinions—in his analysis.  See Pl.'s Hedden Preclusion Mem. at 11. Old Gate cites Hedden's decision to disregard an assessment by the City of Milford determining that the value of the Property was $1,796,120.00 as of October 2021, far below Hedden's estimated value of $9 million.  Hedden has explained that he considered the City's assessment, but ultimately disagreed with it, finding other evidence, such as a Letter of Intent from Brookfield Asset Management ("Brookfield"), more persuasive.  See Transcript of September 6, 2023 Deposition of Michael Hedden ("Pl.'s Hedden Dep. Tr."), Pl.'s Ex. C, at 248:1-250:24 (Doc. No. 146-3).  In this court's view, the substantial gap between Hedden's assessment and the Milford assessment, while perhaps problematic, does not create "'too great an analytical gap' between the data that [he] analyzed and the opinion[s] proffered" sufficient to warrant preclusion of Hedden's valuation opinions.  Ryan v. Nat. Union Fire Ins. Co. of Pittsburgh, P.A., 03-CV-0644, 2010 WL 2232670, at *8 (D. Conn. June 2, 2010) (quoting Fernandez v. Cent. Mine Equip. Co., 670 F. Supp. 2d 178, 183 (E.D.N.Y. 2009)).  In addition, Old Gate

argues that Hedden failed to adequately account for the significant differential between his stated $9 million market value for the Property, and the fact that Old Gate purchased the property for only $2,130,000.  See Pl.'s Hedden Preclusion Mem. at 15.  Again, the court finds that, in this specific instance, thorough cross examination, rather than preclusion, is warranted. Hedden has explained that he believes the price at which Old Gate bought the Property was the "function of a very good purchase price", see Pl.'s Hedden Dep. Tr. at 74:24-74:25, and the factfinder is free to determine whether Hedden's explanation is credible.

Old Gate further argues that Hedden's testimony must be excluded because he relies on insufficient, unknown, or unverified facts.  See Pl.'s Hedden Preclusion Mem. at 17-23.  To be admissible, an expert's opinion must be "based on sufficient facts or data".  See Fed. R. Evid. 702(b).  First, the court disagrees with Old Gate that Hedden's testimony warrants preclusion because his "analysis was based on only six comp[arison] sales, two of which are used twice six years apart."  See Pl.'s Hedden Preclusion Mem. at 18.  The court cannot locate any authority establishing a threshold amount of comparison sales that an appraiser should assess in reaching a valuation assessment, and it cannot say that six comparison sales are insufficient to reach a reliable valuation determination.  The court also disagrees that Hedden's conclusions must be precluded because they were based on incomplete, unknown, or unverified facts.[10]  The various, potential infirmities cited by Old Gate, see id. at 18-23, are the

---

[10] Old Gate lists several ostensibly incomplete facts, including that Hedden (1) did not consider whether comparable properties were seller-financed; (2) did not review title reports for land use restrictions; (3) did not conduct highest and best use analyses for the comparable properties; (4) did not consider that "Land Sale No. 5 was . . . purchased by an abutter"; (5) did not research Land Sale No. 6 "beyond a CoStar database search"; and (6) did not make adjustments to his evaluation of Land Sale No. 7 even though it "featured a billboard directly facing I-95."  See Pl.'s Hedden Preclusion Mem. at 18-20.

types of issues that are, in this court's view, best addressed through vigorous cross examination, rather than preclusion.

Old Gate also asserts that Hedden's valuation analysis suffers from inconsistencies and self-contradictions. Once again, having reviewed the various examples cited by Old Gate, see id. at 29-33,[11] the court cannot conclude that these apparent inconsistencies or contradictions warrant exclusion, rather than rigorous cross examination.[12]

Finally, Old Gate also asserts that much of Hedden's analysis relies on unclear, unsupported rationales, and that Hedden fails to disclose underlying data sufficient to replicate his analysis. See id. at 23-29. Indeed, the court agrees with Old Gate that this aspect of Hedden's testimony is highly problematic. For example, Hedden testifies that, in his sales comparison analysis, he adjusted for the fact that one of the comparable properties had "approximately 1 to 1.5 acres of wetlands", but his Report lacks any explanation as to how he made this adjustment. See Pl.'s Hedden Dep. Tr. at 149:22-150:13. His deposition testimony is also vague; he attests that the adjustment for the adjoining wetlands was "cancel[led] out" by certain "offsetting considerations", without providing any plausible explanation as to how these factors perfectly cancel out one

---

[11] Specifically, Old Gate points to Hedden's (1) ostensibly inconsistent assumptions about the annual value increase of the comparable properties; (2) apparent misstatements in his deposition testimony regarding whether he considered the Property to be "vacant land"; and (3) purported overreliance on a single Letter of Intent ("LOI"). Id. at 29-33.

[12] For example, although Old Gate objects to Hedden's heavy reliance on the Brookfield LOI in his valuation analysis, Hedden explained, in his deposition testimony, why he gave significant weight to the Letter. See Pl.'s Hedden Dep. Tr. at 248:24-249:9 (explaining that, in his view, Brookfield's LOI warranted significant weight because "Brookfield has a better understanding of the value of [the Property]" and was "willing to put the time[,] energy[,] effort[,] and . . . money up" to move forward with a potential transaction). Whether Hedden's explanation credibly justifies his heavy reliance on the Letter is, in this court's view, an issue that is best left to the factfinder when weighing the evidence.

another.  See id. at 150:11-151:4.  Even more problematically, Hedden's analysis categorizes certain factors relating to the comparable properties as either "superior" or "inferior", without tying these qualitative labels to any specific percentages or dollar amounts.  See Hedden Report at 41-42; Pl.'s Hedden Preclusion Mem. at 25-26. Indeed, in his deposition testimony, Hedden conceded that "underlying calculations and percentages are not reflected for each of th[e] factors" that are deemed either "superior" or "inferior".  See Pl.'s Hedden Dep. Tr. at 188:11-188:17.  As a result, the Report, in its current form, provides no discernable methodology sufficient for this court to understand how Hedden determined the adjusted sale prices.  As such, this aspect of Hedden's valuation analysis fails to meet even the minimal threshold of Daubert.  See Water Pollution Control Auth. of City of Norwalk v. Flowserve US Inc., No. 14-CV-00549, 2018 WL 1525709, at *17 (D. Conn. March 28, 2018), aff'd, 782 Fed. Appx. 9 (2d Cir. 2019) (excluding an expert's opinion due to the expert's "failure to disclose the calculations and data on which her opinions are based"); 24/7 Records, Inc. v. Sony Music Ent., Inc., 514 F. Supp. 2d 571, 576 (S.D.N.Y. 2007) (precluding a valuation opinion where the expert did not "explain how he valued [certain] factors nor how he assessed their relative significance").[13]  Accordingly, the court concludes that Hedden's valuation opinions cannot be admitted in their current form.

---

[13] In addition, Old Gate argues that Hedden made "ad hoc, subjective determinations", and it cites, as an example, that Hedden used two of three properties as comparisons for both his 2017 valuation and 2023 valuation, while only using the third property as a comparison for the 2017 valuation. See Pl.'s Hedden Preclusion Mem. at 27-28.

However, on this point, Hedden has explained that this third property was "the oldest" and "the smallest", which led him to conclude that it should be excluded from the 2023 valuation analysis.  See Pl.'s Hedden Dep. Tr. at 200:22-201:3.  Given that Hedden has proffered some rational basis for excluding this third property from his 2023 analysis, the court finds that the adequacy his explanation is better addressed through cross examination, rather than preclusion.

Having determined that Hedden's valuation opinions do not currently meet the reliability threshold, the court now considers whether to permit Paddock a final opportunity to submit a revised Report. Here, it is possible that Hedden could address the aforementioned defects by explaining, with reasonable clarity and precision, the methodology that he used when he made his adjustments. Because it appears that the "deficiencies in [Hedden's] expert [valuation] opinion[s]" are "ones that could potentially be remedied," see Amorgianos v. Nat'l R.R. Passenger Corp., 137 F. Supp. 2d 147, 191 (E.D.N.Y. 2001), the court grants Paddock leave to file a supplement from Hedden that properly addresses the deficiencies identified by the court in this Ruling. The court notes that Hedden does not have the court's permission to alter his opinions; he is only permitted to disclose, in his amended Report, the methodology and bases underlying his already-disclosed opinions. The plaintiff's Motion to Preclude Hedden's valuation opinions is therefore granted, without prejudice to Hedden filing an amended report.

c)    Relevance

Finally, Old Gate asserts that several of Hedden's opinions are irrelevant to this action.[14]  See Pl.'s Hedden Preclusion Mem. at 34, 36-38. It appears that these opinions bear some relevance to Paddock's Section 113 counterclaim, which permits courts to use equitable factors when allocating remediation costs. See 42 U.S.C. § 9613(f)(1); Goodrich Corp. v. Town of Middlebury, 311 F.3d 154, 170 (2d Cir. 2002) (noting that the allocation of response costs under section 113(f) is "an equitable

---

[14] One of the opinions that Old Gate asserts is irrelevant is Hedden's purported economic rationality opinion.  See Pl.'s Hedden Preclusion Mem. at 34, 38.  However, in its Opposition, Paddock confirmed that Hedden "does not have any expert opinion concerning whether Old Gate acted in a manner that is economically rational."  See Def.'s Hedden Preclusion Opp. at 37.

determination based on the district court's discretionary selection of the appropriate equitable factors in a given case").  Because the cited opinions relate to the issue of whether Old Gate stands to benefit financially from remediation, the court finds that they are sufficiently relevant to an analysis of equitable factors under section 113(f).

However, the court agrees with Old Gate that two sets of Hedden's opinions, (1) his opinion that the Town of Milford "has no apparent intention of changing the zoning of the Subject Property" and (2) his entrepreneurial profit opinions, see Hedden Report at 7-8, are impermissible.

First, his opinion regarding the Town of Milford constitutes impermissible speculation regarding a third-party entity's intent.  See Linde v. Arab Bank, 920 F. Supp. 2d 282, 285 (E.D.N.Y. 2011) ("Insofar as many of the expert reports submitted by the defendant express opinions as to the state of mind, intent, or motive of a government, a charitable entity, or a person, they do not contain relevant expert evidence.); In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony."). Such speculation about a locality's motivations or "intentions" is not appropriate expert testimony and would not be helpful to a factfinder.

Second, his entrepreneurial profit opinions consist of nothing more than basic mathematical calculations.  See Hedden Report at 25-27.  Such calculations could easily be performed by a trier of fact; there is simply no need for the calculations, and the opinions derived therefrom, to be presented in the form of expert testimony.  As such, these opinions are inadmissible.  See FFP, LLC v. Xaxis US, LLC, No. 14-CV-6172, 2017 WL 11456572, at *1-2 (S.D.N.Y. Feb. 13, 2017).

26

The plaintiff's Motion to Preclude Hedden's opinions on the ground that they are irrelevant is therefore granted as to the opinion regarding Milford's intent and the opinions regarding entrepreneurial profit and denied as to the other opinions.

>    d)    Conclusion

In sum, the plaintiff's Motion to Preclude Hedden's testimony is granted in part and denied in part.  The court grants the plaintiff's Motion with respect to Hedden's valuation opinions, his opinion as to Milford's zoning intentions, and his entrepreneurial profit opinions, but denies it as to Hedden's other expert opinions.  The exclusion of Hedden's valuation opinions is, however, granted without prejudice to Paddock filing an amended Report, given that the underlying infirmities could potentially be corrected. Accordingly, Paddock may serve an amended Report, containing a revised valuation analysis in accordance with this Ruling, twenty-one days from the date herein.  If Paddock submits a revised Report, the parties must then schedule a time for Old Gate to conduct a short, follow-up deposition of Hedden, at Paddock's expense.  Old Gate may then submit an additional rebuttal to Hedden's supplement within three weeks after the deposition.

>    2.    Nicholas Hastings

Old Gate has also moved the court to preclude certain testimony from Nicholas Hastings, a licensed environmental expert ("LEP") and one of Paddock's expert witnesses.  See Pl.'s Hastings Preclusion Mem.  Old Gate asserts that (1) Hastings should be precluded from offering affirmative opinions that he has not already disclosed in his Report; (2) Hastings' criticism of the sampling methodology undertaken by Adam

Henry ("Henry"), plaintiff's environmental expert, is unreliable and irrelevant; and (3) Hedden's "percentage of area sampled" analysis is unreliable and irrelevant.[15]  See id.

### a)    Preclusion of Additional Affirmative Opinions

First, Old Gate requests an order from the court affirmatively precluding Hastings from offering testimony that he has not previously disclosed in his Report or deposition testimony.  See id.; Plaintiff's Reply Memorandum in Support of Motion to Exclude Testimony of Nicholas Hastings, at 1 (Doc. No. 162).  Such an order is, in this court's view, unnecessary.  It should already be well-known to Paddock that Hastings will not be permitted to offer any opinions beyond what Paddock has already properly disclosed to Old Gate.  Should Hedden attempt to offer an opinion, at trial, that was not timely and properly disclosed, the court will preclude him from testifying as to that opinion.  The plaintiff's request for a preemptive order precluding such testimony is therefore denied.

### b)    Hastings' Criticisms of Plaintiff's Expert's Sampling Methodology

Next, Old Gate seeks to exclude Hastings' conclusions on the grounds that they are subjective, inconsistent, and do not correspond to any established standards.  See Pl.'s Hastings Preclusion Mem. at 15-23.  The court agrees with Paddock that each of the plaintiff's criticisms of Hastings' testimony in Section II.A of its Memorandum, see id., go to the weight of Hastings' rebuttal testimony, rather than its admissibility. Hastings "need not identify alternative or better methodologies"—including, for example, a particular threshold of adequate samples—to render his opinions admissible.  Joffe v.

_____

[15] Old Gate does not dispute that Hastings is qualified to testify.  Indeed, having reviewed Hastings' Report and corresponding materials, see Expert Report of Nicholas Hastings, Pl.'s Ex. C (Doc. No. 148-3), the court finds that he is qualified.

King & Spalding LLP, No. 17-CV-3392, 2019 WL 4673554, at *14 (S.D.N.Y. Sept. 24, 2019).

Old Gate further asserts that Hastings improperly relies on a "percentage of area sampled" analysis that has never been used before and has no standards against which it can be evaluated, rendering it unreliable. See Pl.'s Hastings Preclusion Mem. at 23-27. As Old Gate correctly notes, courts disfavor untested methodologies that are not generally accepted in the relevant expert community. See Amorgianos, 303 F.3d at 265. Hastings offers this analysis to illustrate his conclusion, as a rebuttal to Henry's Report, that Henry's analysis relied on too few soil samples, see Expert Report of Nicholas Hastings ("Hastings Report"), Pl.'s Ex. 3, at 3-21—3-26 (Doc. No. 148-3), which Henry vigorously disputes in his Rebuttal Report, see Plaintiff's Rebuttal Expert Report of Adam Henry ("Henry Rebuttal Report"), Def.'s Ex. 5, at 42 (Doc. No. 154-5). As noted above, Hastings need not proffer a particular threshold percentage of soil sampling for his opinions to be admissible. Joffe, 2019 WL 4673554, at *14. Moreover, while often disfavored, courts have permitted experts to utilize methodologies even if they are not commonly used within a given industry. See Silivanch v. Celebrity Cruises, Inc., 171 F. Supp. 2d 241, 268-70 (S.D.N.Y. 2001). Here, Old Gate has not given the court any specific reason to doubt the veracity of Hastings' measurements and calculations, and the court finds that Old Gate's critiques of Hastings' analysis are appropriately addressed through cross examination—and Henry's rebuttal testimony—rather than preclusion.

Finally, the court cannot conclude that Hastings' testimony is wholly unhelpful to the trier of fact and therefore warrants exclusion. Hastings' testimony raises potential

limitations and infirmities in the specific methodological approach taken by plaintiff's expert. In turn, the court finds Hastings' testimony is sufficiently relevant and will permit him to offer his critiques at trial.

      c)     Conclusion

For the reasons stated above, the plaintiff's Motion to Preclude the testimony of Nicholas Hastings is denied.

      3.     Adam Henry

Paddock moves to preclude various opinions proffered by Adam Henry, an LEP and Old Gate's environmental expert. See Def.'s Henry Preclusion Mot. These opinions include Henry's (1) opinions as to possible remedies and order of magnitude costs; (2) opinions as to the source of the contamination; and (3) opinions as to O-I Milford STS, Inc.'s compliance with certain certifications.[16] See Defendant Paddock's Memorandum in Support of Motion to Exclude Opinions and Testimony of Adam Henry ("Def.'s Henry Preclusion Mem."), at 14-31 (Doc. No. 153).

      a)     Possible Remedies and Order of Magnitude Costs

Paddock contends that Henry's remedial opinions are unreliable, and that his opinions on "order of magnitude" costs are both unreliable and irrelevant. See id. at 16-23. The court respectfully disagrees.

First, the court does not view Henry's remedial opinions as speculative expressions of mere possibilities, as Paddock contends. Rather, Henry's Report details

---

[16] Although Paddock contends that Henry is not qualified to offer an opinion on O-I Milford STS, Inc.'s compliance with certifications, it notes that it otherwise does not contest Henry's qualifications to render expert testimony in this case. See Def.'s Henry Preclusion Mem. at 15 n.5. Indeed, having reviewed Henry's Report and corresponding materials, see Plaintiff's Amended Expert Report of Adam T. Henry ("Henry Report") (Doc. No. 154-2), the court finds that he is qualified to testify as to costs in this case.

two plausible remediation scenarios, based on the facts currently know to him, and provides reasoned estimates as to the costs of these scenarios.  See Plaintiff's Amended Expert Report of Adam T. Henry ("Henry Report"), at 36-37 (Doc. No. 154-2).  Such expert testimony is permissible, and any infirmities are properly addressed through cross examination.  See EEOC v. Morgan Stanley & Co., 324 F. Supp. 2d 451, 468 (S.D.N.Y. 2004) (permitting calculations based on three potential scenarios).

Second, the court finds that Henry's "order of magnitude" cost estimates are sufficiently reliable and relevant.  Notably, Paddock does not assert that "order of magnitude" cost analysis is, in and of itself, an unreliable methodology.  Rather, it merely argues that Henry's estimates may be off by one magnitude and are subject to yet-to-be-determined variables.  See Def.'s Henry Preclusion Mem. at 19-21.  However, Henry has provided this court with documentation and calculations supporting his cost estimates, see App'x F to Henry Report, and any potential inaccuracies or undetermined variables can be, in this court's view, addressed through cross-examination.  Paddock's contention that such estimates are irrelevant presents a stronger argument, given the Second Circuit's admonition against lump-sum awards of future costs under CERCLA.  See Goodrich Corp., 311 F.3d at 175.  Nonetheless, given that the defendant has raised a Counterclaim under section 113(f), which allows for allocation of response costs based on equitable determinations left to the discretion of the court, see id. at 170, the court cannot say that an estimate of future costs would be wholly irrelevant to allocation under section 113(f), such that exclusion is warranted.

Accordingly, the court declines to exclude Henry's opinions on possible remedies and "order of magnitude" costs.

b)      Source of Contamination

Paddock asserts that Henry's opinions that Paddock is responsible for the contamination at the Property should be excluded because Henry (1) does not know when the contamination occurred; (2) failed to exclude ATI as a source of the contamination; and (3) has no basis for his opinion that Paddock caused arsenic or chlordane contamination at the Property.  See Def.'s Henry Preclusion Mem. at 23-29. These objections plainly go to weight, rather than admissibility.  CERCLA does not require an expert to pinpoint a precise date as to when contamination occurred.  See Niagara Mohawk Power Corp. v. Chevron, 596 F.3d 112, 136 (2d Cir. 2010) (noting that CERCLA liability may be inferred from the totality of circumstances).  Here, Henry analyzed historic reports and conducted his own independent assessment, concluding, based on the totality of the evidence, that at least some of the contamination of hazardous substances occurred during the defendant's operations.  Moreover, Henry's Report clearly noted that some contamination may have occurred during ATI's tenure. See Henry Report at 18.  Whether he properly concluded that at least some of the contamination occurred during defendant's tenure is a question for the factfinder, after cross examination.  The court also declines to exclude Henry's opinions regarding the issue of whether defendant disposed of arsenic and chlordane on the Property because, contrary to Paddock's assertion, Henry proffers bases for his opinions.  See, e.g., Henry Rebuttal Report at 10-11 (noting (1) that O-I used algicides, which are often a source of arsenic, and (2) that O-I used pesticides, with chlordane being a commonly used pesticide during this time period).  The strength of his bases is best addressed through cross-examination, rather than exclusion.

The defendant's Motion to Preclude Henry's testimony as to the source of contamination is therefore denied.

           c)      Opinions on O-I Milford STS, Inc.

Finally, the court does not view Henry's opinions regarding O-I Milford STS, Inc. as impermissible legal opinions that exceed his qualifications.  Contrary to Paddock's assertion, Henry does not opine that, under the law, Paddock is a successor to O-I Milford STS, Inc.  Rather, he appears to assume that O-I Milford STS, Inc. is an affiliate of the defendant, explains the relevant certifications that O-I Milford STS, Inc. filed with DEEP, and opines that O-I Milford STS, Inc. did not adhere to the requirements of these certifications.  See Henry Report at 7-8.   The court finds that Henry, as a Connecticut LEP, is sufficiently qualified to render such opinions, and that these opinions may be relevant to the issue of whether the defendant adhered to its remedial obligations.  Such testimony does not impermissibly "communicat[e] a legal standard".  See Hygh v. Jacobs, 961 F.2d 359, 364 (2d Cir. 1992).  The Motion to Preclude Henry's opinion on O-I Milford STS, Inc. is thus denied.

           d)      Conclusion

For the reasons stated above, the defendant's Motion to Preclude Henry's testimony is denied.

    B.    Plaintiff's Motion for Partial Summary Judgment

Old Gate moves for partial summary judgment as to Counts One and Two of its Complaint on the ground that it has established a prima facie case of liability under section 107(a) of CERCLA.  See Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment ("Pl.'s Summ. J. Mem."), at 7.  In addition, Old Gate

seeks dismissal of various Affirmative Defenses by Paddock or, in the alternative, a determination from this court that Paddock's defenses do not preclude a finding of liability under section 107(a).  See id. at 28-35.

        1.     Prima Facie Liability Under Section 107(a)

Under section 107(a) of CERCLA, a private party may recover, from a potentially responsible party, the costs of responding to a release of hazardous substances.  See Revitalizing Auto Cmtys. Env't Response Tr. v. Nat'l Grid, USA, 10 F.4th 87, 99 (2d Cir. 2021) (citing 42 U.S.C. § 9607(a)).  To establish a prima facie case of liability under section 107(a), a plaintiff must prove, by a preponderance of the evidence:

> (1) [The] defendant fits one of the four classes of responsible parties outlined in [section] 9607(a); (2) the site [at issue] is a "facility" within the meaning of section 107(a); (3) there is a release or threatened release of hazardous substances at the facility; (4) the plaintiff incurred costs responding to the release or threatened release; and (5) the costs and response actions conform to the National Contingency Plan . . . .

B.F. Goodrich Co. v. Murtha, 958 F.2d 1192, 1198 (2d Cir. 1992).  In addition, section 107(a) also requires that (6) the response costs incurred were "necessary".  See Syms v. Olin Corp., 408 F.3d 95, 101 (2d Cir. 2005).

CERCLA "imposes strict liability."  B.F. Goodrich Co., 958 F.2d at 1198.  To determine liability under CERCLA, courts "engage[ ] in a very limited . . . inquiry."  Niagara, 596 F.3d at 131.  A plaintiff need only meet the six aforementioned criteria to establish a prima facie case of liability; the "traditional tort concept of causation plays little or no role" in the court's liability determination.  Id.  It is not until the second phase, "when damages are apportioned, that the relative strength of the evidence of liability becomes a relevant factor."  Id.  Importantly, "CERCLA liability may be inferred from the totality of the circumstances as opposed to direct evidence."  Id.

Here, Old Gate asserts that it has met its burden of proving all six elements of establishing liability under section 107(a) and is therefore entitled to partial summary judgment.  See Pl.'s Summ. J. Mem. at 7.  In turn, Paddock does not dispute that the Property is a "facility" under section 107(a) and that a release of hazardous substances occurred at the Property.  See Def.'s Summ. J. Opp. at 5 n.2.  It contends, however, that there is a genuine issue of material fact as to each of the four remaining elements, thereby foreclosing summary judgment as to liability.  See id. at 5.

First, and most notably, the parties dispute whether Paddock constitutes a "responsible party" under CERCLA.  A defendant is considered a responsible party under section 107(a)(2) of CERCLA if it was a prior owner or operator of a facility at the time of "disposal" of any hazardous substance at the facility.  See New York v. Next Millenium Realty, LLC, 160 F. Supp. 3d 485, 505-06 (E.D.N.Y. 2016).  Under CERCLA, "disposal" means "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any . . . hazardous waste into or on any land . . . so that such . . . hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters . . . ."  42 U.S.C. § 6903(3).  In its Motion, Old Gate asserts that there is no genuine dispute of material fact as to whether there was a disposal of hazardous substances at the Property during O-I's period of operation.  See Pl.'s Summ. J. Mem. at 9-10.

The court respectfully disagrees.  Although Old Gate has proffered evidence suggesting that disposal of hazardous substances occurred during O-I's period of operation, see 1984 DEEP Report; 1994 DEEP Report; HRP Report; ESI Report; Henry Report, Paddock has adduced its own evidence that, when viewed in the light most

favorable, suffices to raise a genuine dispute of material fact as to this issue.[17]

Specifically, Paddock contends that disposal of each of the hazardous substances in question, and the resulting contamination, occurred prior to its period of operations, when A-I was manufacturing its products at the Property.  In support of this assertion, Paddock points to testimony from its expert, Hastings, that ATI used and spilled each of the hazardous substances at issue in this case, as well as petroleum.  See Hastings Report at 1-3, 1-5.  In turn, there is evidence in the record that, during ATI's tenure, ATI's operations at the facility resulted in discharges of waste and contamination.  See, e.g., HRP Report at 17 (noting, inter alia, that ATI "had approximately 20 tanks on the property, some of which are reported to have contained solvents and toxic chemicals" and that "[t]he soils in the area may be contaminated from the storage"); Water Resources Commission Report, Def.'s Ex. 19 (Doc. Ex. 159-20) (finding waste "originat[ing] from floor spills, product dumping and mixing tank(s) waste" during ATI's tenure); 1972 DEEP Memo, Def.'s Ex. 20 (Doc. No. 159-21) (internal memo stating that DEEP "dropped the ball" with respect to proper disposal of waste materials produced by ATI);[18] Hastings Report at 1-4, 1-5 (detailing spills and discharges by ATI).

---

[17] As Old Gate notes, Paddock's Memorandum repeatedly states that there is a genuine issue of material fact as to the source of contamination, which is technically not the proper standard in assessing liability under CERCLA.  See Niagara, 596 F.3d at 131.  However, given that ATI ceased its manufacturing operations in 1976, which is when O-I began its own manufacturing at the facility—resulting in little to no overlap in manufacturing operations between the two entities—it appears to this court that Paddock is essentially contending that there is a genuine issue of material fact as to whether there was a disposal of hazardous substances during Paddock's tenure, which is the correct standard for assessing the "responsibility party" prong of CERCLA liability.  See id.

[18] Although these documents technically constitute hearsay, the HRP Report may nonetheless be admissible under the ancient records exception, see Fed. R. Evid. 803(16); State of N.Y. v. Westwood-Squibb Pharm. Co., Inc., 981 F. Supp. 768, 780 (W.D.N.Y. 1997) (admitting, in CERCLA case, a report under the ancient records exception), and the latter two documents may be admissible as either a public record, a business record, or ancient records, see Fed. R. Evid. 803(6); id. at 803(8); id. at 803(16); Town of Oyster Bay v. Occidental Chem. Corp., 987 F. Supp. 182, 198 (E.D.N.Y. 1997) (noting that government

Moreover, Paddock has cited additional evidence suggesting that the discharge of hazardous substances occurred during ATI's tenure and, in turn, that there may not have been spills or discharges of hazardous substances into the environment during O-I's time as an operator.  See, e.g., Pl.'s Johnson Dep. Tr. at 72:5-73:23, 108:6-110:8, 110:9-114:16 (testimony from O-I's former facility manager that the hazardous substances used at the facility—TCA, freon, and Safety Kleen—were carefully contained and that he does not recall spills or leaks); DAY Report at 30 (finding "very strong evidence to support the conclusion that the contamination originated" during ATI's tenure); DAY Review of Reports, Def.'s Ex. 22, at 21 (Doc. No. 159-23) (concluding, based on its review of two prior reports, that there is conclusive evidence that hazardous waste was discharged during ATI's tenure, and that there is no such evidence regarding the discharge of hazardous substances during O-I's tenure).[19] Viewing this evidence in the light most favorable to Paddock and resolving all ambiguities in its favor, as it must, the court concludes that a reasonable factfinder could potentially find that disposal of hazardous waste did not occur when O-I was an operator at the Property.  See Niagara, 596 F.3d at 136 (finding a genuine dispute of material fact as to CERCLA liability based on competing evidence, including expert evidence, as to when the deposit of hazardous substances occurred); Mid-Town Laundry, LLC v. Pierce, No. 17-CV-00338, 2021 WL 2417672, at *10-11 (N.D.N.Y. June 14, 2021) (finding a genuine issue of material fact as to liability based, in part, on

---

reports containing factual findings regarding the release of hazardous substances are admissible as public records).  Accordingly, the court declines to exclude these Exhibits, at least at this stage, and will consider them for purposes of its Ruling on plaintiff's Motion for Summary Judgment.

[19] Again, while hearsay, these latter two Reports may be admissible as ancient records.  See Fed. R. Evid. 803(16).  It also appears that both parties' experts reviewed these Reports in preparation of their own Reports.  See Hastings Report at 1-7, 7-9; Henry Report at 14.

competing circumstantial evidence regarding the time period in which hazardous substances were released at the facility).[20]

To be sure, Old Gate has proffered substantial evidence of spilling and leakage of petroleum at the Property during Paddock's tenure.  See, e.g., 1984 DEEP Report; Pl.'s Johnson Dep. Tr. at 59:7-60:6.  However, "petroleum products are expressly excluded from the definition of hazardous substances" under CERCLA.  Niagara, 596 F.3d at 133 (citing 42 U.S.C. § 9601(14)).  On the other hand, courts in this Circuit have held that the petroleum exclusion may not apply where the petroleum in question is contaminated with hazardous substances that it does not normally contain.  See, e.g., Cooper Crouse-Hinds, LLC v. City of Syracuse, 568 F. Supp. 3d 205, 232 (N.D.N.Y.

---

[20] In its Reply Memorandum, Old Gate asserts that Paddock's reliance on Niagara and Mid-Town Laundry is "misplaced" because this court "is not presented with a battle of the experts on the issue of liability."  See Plaintiff's Reply Memorandum in Further Support of its Motion for Partial Summary Judgment, at 4 n.12 (Doc. No. 160).  It appears that this argument relates to Old Gate's contention that a finding of liability is warranted because Hastings merely attacks the reliability of plaintiff's expert testimony and offers no affirmative opinion of his own as to whether disposal of hazardous substances occurred during Old Gate's tenure.

The court respectfully disagrees.  First, the court does not read either case to suggest that a genuine issue of material fact as to CERCLA liability can only be raised where there are competing, affirmative expert opinions as to when disposal occurred.  The Niagara court noted that plaintiff and defendant relied on competing circumstantial evidence as to when disposal occurred.  Niagara, 596 F.3d at 136.  Moreover, in Mid-Town, there was no "battle of experts" because only the defendant proffered an admissible expert report; the court relied, in substantial part, on other evidence to find a genuine issue of material fact.  See Mid-Town Laundry, 2021 WL 2417672, at *10.

Second, although Old Gate is correct that Hastings offers no affirmative opinion of his own as to when disposal occurred, the court cannot conclude that his lack of opinion warrants summary judgment in Old Gate's favor.  There is other evidence in the record, beyond Hastings' opinion, sufficient to create a genuine issue of material fact as to liability.  See Section IV.B.1, at 36-37.  Nor does the court agree with Old Gate's view that Hastings effectively conceded, at his deposition, that O-I disposed of hazardous substances during its tenure.  It appears that Hastings' statement that "observations and leakages occurred during [O-I's] tenure" was made in reference to the 1984 DEEP Report, see Pl.'s Hastings Dep. Tr. at 140:25-141:18, which described spillage and leakage of waste oil.  As discussed below, there is a genuine issue of material fact as to whether the petroleum waste ostensibly deposited by O-I falls within the petroleum exception to CERCLA.

2021).  Here, the parties dispute whether there was a disposal of contaminated petroleum during O-I's tenure.  Old Gate points to evidence of TCA-contaminated petroleum found at the Property, see, e.g., ESI Report at 8; Henry Report at 20, while Paddock asserts that there is no evidence that O-I mixed TCA with waste oil and disposed of said substances during its tenure, see Henry Report at 19 (finding that O-I "may have disposed of the waste TCA onsite or mixed it with the waste oil" (emphasis added)).  Based on the totality of the record evidence, the court concludes that there is a genuine issue of material fact as to whether the petroleum exclusion applies to the case at bar.

The court acknowledges the strength of Old Gate's evidence and the limited nature of CERCLA's liability inquiry.  It is well-aware that "CERCLA does not require a smoking gun."  Niagara, 596 F.3d at 136.  Nonetheless, even with CERCLA's strict liability regime and narrow liability inquiry, ordinary summary judgment principles still apply.  See B.F. Goodrich v. Betkoski, 99 F.3d 505, 521-22 (2d Cir. 1996).  Under the specific circumstances of this case, viewing the evidence in the light most favorable to Paddock and resolving all ambiguities in its favor, the court concludes that there are genuine issues of material fact as to whether disposal of a hazardous substance occurred during O-I's time as an operator at the facility.  Accordingly, there are genuine issues of material fact as to whether Paddock constitutes a "responsible party" under section 107(a).  Judgment as a matter of law as to liability, while a very close question, is therefore inappropriate at this stage.

The plaintiff's Motion for Summary Judgment as to Count One is therefore denied.  Because the court has already determined that Old Gate has not established

each element of its <u>prima facie</u> case at the summary judgment stage, it need not

address the other three contested elements at this time.

### 2. Declaratory Judgment

Old Gate also moves for a declaratory judgment that Paddock is liable for future

response costs. <u>See</u> Pl.'s Summ. J. Mem. at 35. Because the court has determined

that there are genuine issues of material fact as to whether Paddock is a "responsible

party" under CERCLA, it cannot issue a declaratory judgment as to future response

costs at this time. The plaintiff's Motion for Summary Judgment as to Count Two is thus

denied.

### 3. Affirmative Defenses

In addition to moving for summary judgment as to its <u>prima facie</u> case, Old Gate

similarly moves for summary judgment as to various affirmative defenses asserted by

Paddock. <u>See</u> Pl.'s Summ. J. Mem. at 28-35.

### a) Fourteenth Affirmative Defense

Old Gate seeks summary judgment as to Paddock's Fourteenth Affirmative

Defense, which, both parties appear to agree, is the only Affirmative Defense asserted

by Paddock that, if proven, would preclude a finding of liability under section 107(a).

<u>See</u> Pl.'s Summ. J. Mem. at 29; Def.'s Summ. J. Opp. at 31. To establish a statutory

defense to section 107(a) liability, "a defendant must prove, by a preponderance of the

evidence, that the threat of release and the resulting damage" were:

> . . . caused solely by—(1) an act of God; (2) an act of war; (3) an act or omission
> of a third party other than an employee or agent of the defendant, or than one
> whose act or omission occurs in connection with a contractual relationship,
> existing directly or indirectly, with the defendant . . . if the defendant establishes
> by a preponderance of the evidence that (a) he exercised due care with respect
> to the hazardous substance concerned, taking into consideration the

characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions . . . .

Prisco v. A & D Carting Corp., 168 F.3d 593, 603 n.8 (2d Cir. 1999) (quoting 42 U.S.C. § 9607(b)).  In the Fourteenth Affirmative Defense, Paddock asserts the "third party" statutory defense, which essentially has four elements: (1) that the contamination was caused solely by a third party; (2) that the contamination did not occur in connection with a contractual relationship between the defendant and the third party; (3) that the defendant exercised due care with respect to the relevant hazardous substances; and (4) that the defendant took precautions against the foreseeable acts of the third party. See id.  Paddock contends that summary judgment is unwarranted because there is a genuine issue of material fact as to each element of the third statutory defense.  See Def.'s Summ. J. Opp. at 31.

First, as discussed above, the court has concluded that Paddock has proffered sufficient evidence to raise a genuine issue of material fact as to whether the disposal of hazardous substances at the Property was confined to ATI's period of operations.  See Section IV.B.1, supra.  By extension, this evidence also raises a genuine issue of material fact as to whether the release of hazardous substances was "caused solely" by ATI.

Second, the court cannot conclude that the lease agreement that existed between O-I and ATI constitutes the sort of "contractual relationship" that prevents Paddock from asserting this statutory defense.  Under section 107, an owner of a facility may be held liable for the acts or omissions of a third party if those acts or omissions occurred "in connection with a contractual relationship".  See Prisco, 168 F.3d at 603

41

n.8.  The Second Circuit has held that "the phrase 'in connection with a contractual relationship' in [section] 107(b)(3) requires more than the mere existence of a contractual relationship between the owner of land on which hazardous substances are or have been disposed of and a third party whose act or omission was the sole cause of the release . . . ."  Westwood Pharms., Inc. v. Nat'l Fuel Dist. Corp., 964 F.2d 85, 91 (2d Cir. 1992).  Accordingly, the contract must "either relate to the hazardous substances or allow the landowner to exert some element of control over the third party's actions."  Id. at 91-92.  Here, the applicability of this rule is unclear, given that O-I was only a tenant, rather than the landowner.  Nonetheless, even assuming the rule applies, the court cannot say that the lease agreement either related to the hazardous substances purportedly discharged by ATI or allowed O-I some element of control over ATI's actions.  The agreement contains no mention of hazardous substances or ATI's manufacturing operations, and it does not appear to provide O-I with any rights or control over ATI's operation.[21]  The court therefore finds that this limitation does not bar Paddock from asserting this statutory defense.

Finally, the court agrees with Paddock that there is a genuine issue of material fact as to whether O-I exercised "due care" with respect to the hazardous substances purportedly disposed by ATI and took precautions against the "foreseeable consequences" of the release of these substances.  The statutory language makes clear that the "due care" inquiry requires consideration of "all relevant facts and circumstances."  42 U.S.C. § 9607(b)(3).  Indeed, both inquiries are, in this court's view,

---

[21] As noted above, ATI's manufacturing operations ceased in 1976, the same year O-I began its manufacturing operations.  See Section II, supra.

42

ill-suited to summary judgment.  The parties vigorously dispute whether O-I acted with

"due care" and took precautions against the "foreseeable consequences" of ATI's

purported contamination, and such factual disputes are best addressed at trial by a

factfinder.[22]

Viewing the evidence in the light most favorable to Paddock, the court cannot

conclude, at this juncture, that Paddock is barred from asserting this statutory defense.

Plaintiff's Motion for Summary Judgment as to Paddock's Fourteenth Affirmative

Defense is thus denied.

b)    Other Affirmative Defenses

As a threshold matter, Paddock "does not contest dismissal of the following

defenses as against Plaintiff's CERCLA Section 107 and 113(g)(2) claims only": the

First, Second, Sixth, Seventh, Ninth, Eleventh, Twelfth, Fifteenth, Seventeenth,

Eighteenth, and Nineteenth Affirmative Defenses.  See Def.'s Summ. J. Opp. at 38.

Accordingly, the court dismisses each of these Affirmative Defenses to plaintiff's

CERCLA claim.[23]

---

[22] The court cannot conclude, at the summary judgment stage, that Old Gate's proffered evidence indisputably shows that Paddock cannot establish that it took precautions against "foreseeable consequences" of ATI's operations or that it exercised due care.  As Paddock notes, the 1984 DEEP Notice did not mention any release or potential release of hazardous substances, such that the court could conclude as a matter of law that O-I was on notice of a release of hazardous substances, see 1984 DEEP Report, and there does not appear to be evidence that the two tanks that O-I purportedly failed to remove were leaking hazardous materials during O-I's operation.  In addition, the court does not view consideration of a prior settlement agreement or O-I's decision to file for bankruptcy to be pertinent and appropriate evidence.

[23] Although the court declines, at this stage, to dismiss these defenses with respect to plaintiff's Connecticut claims and Paddock's Counterclaims, it notes that it is unclear how several of these defenses—such as the statute of limitations and statute of repose defenses—apply to plaintiff's Connecticut claims and defendant's section 113 Counterclaim.  Should Paddock fail to make clear, at trial, how these defenses apply to Old Gate's substantive claims, the court will dismiss them.

Old Gate also moves for dismissal of Paddock's Fifth, Tenth, and Thirteenth Affirmative Defenses, on the ground that "Old Gate has established each element for liability". See Pl.'s Summ. J. Mem. at 34. As discussed above, the court cannot conclude, at this stage, that Old Gate has established that there are no genuine disputes of material fact as to the "responsible party" element of its claim. As such, the court need not dismiss these Affirmative Defenses.[24]

Finally, Old Gate moves for summary judgment as to Paddock's Third, Fourth, Eighth, and Sixteenth Affirmative Defenses, on the ground that none of these Affirmative Defenses constitute defenses to CERCLA liability. However, as Paddock notes, these defenses relate to the issue of apportionment of liability, including whether a defendant should be held only severally liable for their contamination. Because these defenses pertain to the "strength of the evidence of [Paddock's] liability", and because the strength of liability is relevant to the apportionment prong of CERCLA, see Niagara, 596 F.3d at 131; Next Millenium Realty, 160 F. Supp. 3d at 511, the court declines to dismiss them at this stage.

### 4.    Conclusion

For the reasons stated above, the plaintiff's Motion for Partial Summary Judgment is granted in part and denied in part. The Motion is denied as to Counts One and Two; denied as to Paddock's Third, Fourth, Fifth, Eighth, Tenth, Thirteenth, Fourteenth, and Sixteenth Affirmative Defenses; and granted as to Paddock's First, Second, Sixth, Seventh, Ninth, Eleventh, Twelfth, Fifteenth, Seventeenth, Eighteenth,

---

[24] Nonetheless, the court notes that these defenses are almost certainly unnecessary and duplicative, given that the burden to establish liability is on the plaintiff.

and Nineteenth Affirmative Defenses, as applied to plaintiff's claims for liability under CERCLA.

## V.    CONCLUSION

For the reasons stated above, plaintiff's Motion for Partial Summary Judgment (Doc. No. 149) is granted in part and denied in part.  The Motion is denied with respect to Count One and Count Two; denied with respect to defendant's Third, Fourth, Fifth, Eighth, Tenth, Thirteenth, Fourteenth, and Sixteenth Affirmative Defenses; and granted with respect to defendant's First, Second, Sixth, Seventh, Ninth, Eleventh, Twelfth, Fifteenth, Seventeenth, Eighteenth, and Nineteenth Affirmative Defenses, as applied to plaintiff's claims for liability under CERCLA.

The plaintiff's Motion to Preclude (Doc. No. 145) the testimony of Michael Hedden is granted in part and denied in part.  The court grants plaintiff's Motion to exclude Hedden's valuation opinions, his entrepreneurial profit opinions, and his opinion as to Milford's zoning intentions, but denies it as to Hedden's other expert opinions. Paddock may serve an amended Report, with a revised valuation analysis, within twenty-one days from the date herein and in accordance with the conditions imposed by the court.  The plaintiff's Motion to Preclude (Doc. No. 147) the testimony of Nicholas Hastings is denied, and the defendant's Motion to Preclude (Doc. No. 152) the testimony of Adam Henry is also denied.

**SO ORDERED.**

Dated at New Haven, Connecticut this 30th day of May 2024.


 /s/ Janet C. Hall
Janet C. Hall
United States District Judge