**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| OLD GATE PARTNERS, LLC, | : | CIVIL CASE NO. |
|     Plaintiff, | : | 3:18-CV-01657 (JCH) |
| | : | |
| v. | : | |
| | : | |
| PADDOCK ENTERPRISES, LLC, | : | SEPTEMBER 9, 2025 |
|     Defendant. | : | |

**AMENDED BENCH TRIAL RULING***

i

      *This Amended Ruling removes an unintentional blank page 12 present in the prior Bench Trial Ruling.  In all other respects, this Amended Ruling reflects the prior Bench Trial Ruling.

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................... 1

II.    FINDINGS OF FACT ................................................................................... 1

   A.    Aerosol Techniques Incorporated ...................................................... 2

   B.    Owens-Illinois Incorporated ............................................................... 3

   C.    Old Gate ............................................................................................. 8

      1.    Old Gate's Purchase of the Property ....................................... 8

      2.    Phase I, II, and III Environmental Site Assessments and Remedial
Action Plan ............................................................................... 8

         a.    Areas north and northeast of the manufacturing building ................ 10

         b.    Area east of the manufacturing building ............................................ 11

         c.    Area southeast of the manufacturing building.................................... 12

         d.    Area south of the manufacturing building .......................................... 12

         e.    Stormwater Management System....................................................... 12

         f.    Manufacturing Building ...................................................................... 13

         g.    Railroad Tracks.................................................................................. 13

      3.    Remediation Costs ................................................................. 13

      4.    Old Gate's Efforts to Sell the Property.................................... 14

III.   CONCLUSIONS OF LAW ........................................................................ 15

   A.    Old Gate's Section 107(a) Claim for Response Costs ............................ 16

      1.    Potentially Responsible Party.................................................. 17

      2.    Costs Incurred by Old Gate .................................................... 20

      3.    Necessary Costs in Conformity with NCP .............................. 21

      4.    Paddock's Affirmative Defenses.............................................. 25

         a.    Third-Party Defense........................................................................... 25

         b.    Divisibility Defense............................................................................. 27

   B.    Paddock's Section 113(f)(1) Contribution Claim ..................................... 28

      1.    Bona Fide Prospective Purchaser .......................................... 29

      2.    Remaining Defenses ............................................................... 31

   C.    Equitable Allocation of Past and Future Response Costs .................... 32

      1.    Waste Attributable to Each Party ........................................... 33

2.    Level of Culpability ................................................................. 34

3.    Degree of Benefit ................................................................... 35

4.    Standard of Remediation ......................................................... 35

IV.    CONCLUSION ........................................................................... 37

## I.     INTRODUCTION

The plaintiff, Old Gate Partners, LLC ("Old Gate"), brings this lawsuit to recover response costs under sections 107(a) and 113(g)(2) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9607(a) and 9613(g)(2).  Amended Complaint ("Am. Compl.") (Doc. No. 45).[1]  Old Gate seeks to recover costs that it expended, and may expend in the future, to remediate the property it owns, at 265–269 Old Gate Lane, Milford, Connecticut ("269 Old Gate" or "the Property").  See id.  The defendant, Paddock Enterprises, LLC ("Paddock"), countersues under sections 113(f)(1) and (g)(2) of CERCLA, 42 U.S.C. §§ 9613(f) and (g), claiming that Old Gate is required to contribute to present and future response costs.  See Amended Answer, Counterclaim ("Am. Answer, Countercl.") (Doc. No. 51).

This Bench Trial Ruling contains the court's findings of fact and conclusions of law based on the evidence presented at a bench trial completed on June 5, 2025.  See June 5, 2025 Minute Entry (Doc. No. 248).

## II.     FINDINGS OF FACT[2]

The Property at issue measures approximately 15.9 acres on which are four buildings: a small pump house on the western-most side of the property, a laboratory on the northwest corner of the property, an office on the northern part of the property, and a sizable manufacturing building on the eastern half of the property.  Appendix A.  On the west, south, and east of the manufacturing building are drainage swales and

---

[1] Old Gate did not pursue the state law claims pled in its Amended Complaint.  See Joint Pretrial Memo (Doc. No. 206) at 6.

[2] While the court sets out findings of fact in the following section, infra, part II, the court reserves for the Conclusions of Law section, infra, part III, its discussions as to whether either of the parties have satisfied their burdens.

1

retention basins, which are designed to handle groundwater.  See Pl.'s Ex. 4 at OI_OG00000553–54.  Various underground and above ground tanks were placed to the northeast and east of the manufacturing building.  Pl.'s Ex. 4 at OI_OG00000549; Pl.'s Ex. 24 at OI_OG00005847.  These tanks contained fuel oil, hydraulic oil, and waste oil, in addition to a cleaning agent.  See id.  To the far east of the property is a railroad spur, which runs parallel to railroad tracks on which Metro-North Railroad operates.  See Appendix A.

Over the years, a variety of entities have owned or leased 269 Old Gate.  Three of these entities are relevant to resolving this matter and are discussed below.

A. Aerosol Techniques Incorporated

Aerosol Techniques Incorporated ("ATI") constructed the buildings on 269 Old Gate and owned and occupied the Property from 1966 until 1976.  Pl.'s Ex. 23 at OI_OG00001798.  There, ATI manufactured products such as pesticides, room deodorants, disinfectants, and cleaning products.  Pl.'s Ex. 24 at OI_OG00005836.  There is limited information about the chemical composition of the products used by ATI as part of its production process on the Property.  Trial Tr. Day Two Afternoon (Doc. No. 247) at 177:10–178:15, 205:20–25, 206:9–12.  It is known, however, that ATI used perchloroethylene, formaldehyde, isopropyl alcohol, and pesticides as part of its production process.  Id. at 177:2–6.

In the ordinary course of business, ATI regularly cleaned mixing drums; it primarily used ethanol or water to clean the drums and generated approximately 5,000 gallons of liquid waste each day.  Def.'s Ex. 124 at OI_OG00001512.  The wastewater was comprised of approximately 95% water and the remaining 5% contained a mixture of ethanol, methylene chloride, solvent cleaners, and the chemical composition of the

products ATI produced.  Trial Tr. Afternoon Day One at 195:25–196:8.  ATI sent this wastewater to the town's sewage treatment plant and to wetlands to the southwest of the Property.  Pl.'s Ex. 24 at OI_OG00005838.  In 1973, the Connecticut Department of Environmental Protection directed ATI to establish its own sanitary sewer system, though it is unclear whether ATI did so.  Id.

ATI experienced periodic wastewater spills.  In 1973, wastewater flowed across the floor of the manufacturing building and out of a loading dock door; the door was on the south side of the building.  Def.'s Ex. 124 at OI_OG00001512.  In 1975, ATI reported a 3,000-gallon wastewater spill to the Connecticut Department of Environmental Protection; the chemical composition of the wastewater spill is unknown. Id.  This 1975 wastewater spill flowed into a retention basin on the southwestern portion of the property near the manufacturing building.  See id.

B. Owens-Illinois Incorporated

On December 24, 1975, O-I, Paddock's predecessor in interest, entered into a sublease with ATI for portions of the Property.  Joint Pretrial Memorandum, Stipulation of Uncontroverted Facts ("Stipulations") (Doc. No. 201-8) at ¶ 25.  O-I ceased operating on the Property sometime in 1987.  Id. at ¶ 37.[3]  O-I's interest in the property as a lessee did not terminate, however, until Thomas J. Young, signing on behalf of both O-I

---

[3] In its Proposed Findings of Fact and Conclusions of Law, Paddock asserts that a company called Constar purchased O-I Milford STS, an apparent subsidiary of O-I, in July 1987 and changed the name O-I Milford STS to SP Milford, Inc.  See Def.'s Findings of Fact and Conclusion of Law (Doc. No. 202-1) at ¶¶ 95–99.  The court, however, cannot make a finding as to whether this purchase occurred because the exhibits cited by Paddock in its Proposed Findings of Fact and Conclusions of Law, in support of this assertion that Constar purchased O-I Milford, were not admitted at trial.  Compare id. (citing Defendant's Exhibits 118 and 119), with Exhibit and Witness List (Doc. No. 249).  Further, the court is aware of no trial testimony explaining whether and when, specifically, this purchase would have occurred.

and another O-I entity called O-I General Inc., executed a lease termination agreement effective May 18, 1989.  Pl.'s Ex. 21.

O-I produced plastic beverage bottles on the Property.  Id. at ¶ 26; Pl.'s Ex. 4 at OI_OG00000555.  It did so by heating plastic polyethylene resin pellets that were stored in six silos to the east of the manufacturing building and injecting the plastic pellets into molds using hydraulic injection molding machines.  See id; Pl.'s Ex. 44 at OI_OG00007165.  Once the bottles were formed using the hydraulic injection molding machines, they were heated into their final form using blow molding machines.  See Pl.'s Ex. 115A at OI_OG00000702.  The hydraulic oil used by the injection molding machines was stored in a 10,000-gallon underground tank to the east of the manufacturing building.  Id. at OI_OG0000704.  This hydraulic oil was periodically circulated through chilling towers located just outside of the manufacturing building where non-contact cooling water circulated in the chilling machines to lower the temperature of the hydraulic oil.  See id. at OI_OG00000702; Pl.'s Ex. 4 at OI_OG00000555.  Old Gate's environmental expert witness, Adam Henry ("Mr. Henry"), testified at trial that the water in these chilling towers likely contained an arsenic-bearing algicide.  Trial Tr. Afternoon Day One at 204:21-25:2; 215:11-16.

O-I stored waste oil in two 1,000-gallon above ground storage tanks to the northeast and east of the manufacturing building.  See Pl.'s Ex. 115A at OI_OG00000704–05, OI_OG0000711; Pl.'s Ex. 4 at OI_OG00000545.  The tanks sat on concrete pads and were surrounded by low concrete walls and roofs.  See Pl.'s Ex. 115A at OI_OG0000711.  These tanks contained hydraulic oil from the molding

machines; O-I produced between 5,000 to 6,000 gallons of hydraulic waste oil annually. Pl.'s Ex. 4 at OI_OG00000547–48.

The manufacturing building contained several boilers, which used number 2 fuel oil stored in two 10,000-gallon underground tanks to the east of the manufacturing building.  Pl.'s Ex. 115A at OI_OG00000703–04.  Near these fuel oil tanks, and also to the east of the manufacturing building, were seven oil insulated electrical transformers. Pl.'s Ex. 4 at OI_OG00000551.  Tests performed in 1984 revealed that five of these transformers contained polychlorinated biphenyls ("PCBs").  Id.  Some of the transformers were located above "undiked concrete pads," while others were on a gravel surface.  Pl.'s 115A Ex. at OI_OG00000705.

O-I used certain products to maintain its production equipment.  By at least 1986, the primary cleaning fluid used by O-I was 1, 1, 1−trichloroethane ("TCA").  Pl.'s Ex. 23 at OI_OG00001804.  Indeed, O-I used about 5,500 gallons of TCA annually and stored the TCA in a 500-gallon above ground tank adjacent to the manufacturing building, to the east.  Pl.'s Ex. 36 at GZA3120; Pl.'s Ex. 4 at OI_OG00000549.  The TCA storage tank was accessible via a spigot inside the manufacturing building, and a sign in the manufacturing building directed employees to the location of the TCA storage.  Pl.'s Ex. 23 at OI_OG00001805; Pl.'s Ex. 115A at OI_OG00000703.  O-I used the TCA to clean, inter alia, the hydraulic molding machines.  See Pl.'s Ex. 23 at OI_OG00001804.  O-I also used ZEP Formula 940-E, a caustic cleaner used to remove oil and grease; this cleaning product was stored in 55-gallon drums.  Pl.'s Ex. 115A at OI_OG00000703; Trial Tr. Afternoon Day One at 200:18-23.

5

During O-I's tenancy of the Property, various environmental onsite inspections revealed oil staining near the various oil tanks, cooling towers, and retention basins. See Pl.'s Ex. 23 at OI_OG00001800 (oil staining in the retention basin); Pl.'s Ex. 115A at OI_OG00000704 (staining near the 10,000-gallon oil tanks and cooling towers to the east of the manufacturing building). One of these inspections also identified an "oily sheen" appearing in a retention basin to the south of the manufacturing building. Pl.'s Ex. 115A at OI_OG00000705. This oily sheen originated from O-I's cleaning of equipment as well as from the waste oil tanks and hydraulic oil pipes. Id.

In 1984, an inspection performed by the Connecticut Department of Environmental Protection revealed that "the gravel adjacent to the above ground waste oil tank is . . . stained." Pl.'s Ex. 2 at OI_OG00007001; see Trial Tr. Morning Day One (Doc. No. 244) at 144:11–16. This inspection also revealed oil-stained gravel in an area southeast of the manufacturing building where O-I had been storing 50 drums of waste oil. Pl.'s Ex. 2 at OI_OG000070001; Trial Tr. Afternoon Day Two at 197:2-9.

In 1988, Day Engineering oversaw the collection of soil samples taken from sites east of the manufacturing building. Pl.'s Ex. 84 at OI_OG00000914–15. The samples revealed the presence of TCA and tetrachloroethylene ("PCE"). Id. Soil borings taken the same year from locations east and northeast of the manufacturing building revealed the presence of free-moving hydraulic oil. Id. at OI_OG OG00000922, OI_OG00000966, OI_OG00000967. Testing of this hydraulic oil revealed the presence of TCA. Id. at OI_OG OG00000922.

In 1990, after O-I terminated its lease, Enviro-Sciences Incorporated ("ESI") completed a site investigation report for the then owners of the Property, Milford

Connecticut Associates LP.  See Pl.'s Ex. 23 at OI_OG00001792.  The report was based on a site inspection conducted by ESI in March 1989, and soil samples taken from the Property between March 21, 1989 and October 27, 1989, concluded that "the chief soil contaminants are PCE, [TCA], and [a] suite of chlorinated solvents."  Id. at OI_OG00001796, OI_OG00001801–OI_OG00001802.  Indeed, ESI concluded that the "dominant contaminant" in groundwater below the Property was TCA, and that this TCA reached the groundwater by leaching through the soil on the Property.  See id. at OI_OG00001804.  ESI suggested that the TCA reached the soil through leaking waste oil tanks, which held spent hydraulic oil used by the molding machines.  Id. at OI_OG00001805.  ESI concluded that there was "clear evidence" waste hydraulic oil was discharged "to the soils on the [Property] during O-I's occupancy, and that the waste oil was contaminated with [TCA]."  Id.  ESI continued, "[t]here can be no doubt that O-I and O-I alone is responsible for the [TCA] contamination of the soil . . . on the site."  Id.  Along similar lines, ESI also concluded the Property was contaminated with PCE.  Id. at OI_OG00001806.  ESI asserted PCE was intermingled with oil collected from the Property, which ESI claimed suggested there was a "direct relationship between the oil and the PCE contamination."  Id.

In 1994, the Connecticut Department of Environmental Protection prepared a preliminary assessment report to determine whether the Property should be admitted into the Department of Environmental Protection's superfund program.  Trial Tr. Afternoon Day One at 191:15-21.  The Report notes "[t]here is extensive documentation of spillage of oils and solvents associated with O[-]I's operations."  Pl.'s Ex. 24 at OI_OG00005863.

C.  Old Gate

      1.    Old Gate's Purchase of the Property

The plaintiff contracted to purchase 269 Old Gate on August 10, 2016.  Trial Tr. Morning Day One (Doc. No. 244) at 29:5–15.  The contract included an environmental provision noting that the buyer and seller desired that the property would be accepted into Connecticut's Abandoned Brownfield Program.  Def.'s Ex. 130 at OI_OG00004251. Joseph Rutigliano ("Mr. Rutigliano"), the sole Member of Old Gate, testified at trial that this provision was included in the contract because, at the time, he knew the property required remediation.  See Trial Tr. Morning Day One at 30:15–25.  The contract permitted Old Gate to perform a site assessment and to take soil and groundwater samples prior to closing.  Def.'s Ex. 130 at OI_OG00004326.  The contract was subsequently amended to reflect that the Property was accepted into the Abandoned Brownfield Program; the Amendment also revised the purchase price of the Property to $1,264,819.20, and required Old Gate to assume any of the delinquent taxes owed on the Property.  Def.'s Ex. 143 at OI_OG00007844–45.  The parties completed the sale on June 2, 2017.  Trial Tr. Morning Day One at 36:10–23. The purchase price was $2,173,522.20. Def.'s Ex. 130 at OI_OG00004255; Trial Tr. Morning Day One at 31: 11-12.

      2.    Phase I, II, and III Environmental Site Assessments and Remedial Action Plan

After the parties executed the contract of sale, Old Gate retained the law firm of McCarter & English and the environmental consulting company, GZA, to investigate the environmental contamination of the site and, if possible, enter the site in the State of Connecticut's brownfield cleanup program.  Trial Tr. Morning Day One at 36:24–39:3.

Invoices prepared by McCarter & English, which are addressed to Old Gate, reflect that the environmental services performed by the firm during this period amounted to $25,753.50.  Id. at 41:11–15; Pl.'s Ex. 78.

GZA prepared various reports on behalf of Old Gate in which it documented the contamination on the Property and suggested a plan to remediate the contamination. See Trial Tr. Morning Day One at 44:7–17, 47:23–48:3.  In October 2016, prior to Old Gate closing on the property, GZA prepared a Phase I Environmental Site Assessment. Id. at 76:3–6.  The Phase I Environmental Site Assessment Report summarized past environmental reports, some of which the court has already described, supra, part II.A–B, and included observations made by GZA personnel who toured the Property.  See Pl.'s Ex. 36 at GZA3136–38.  Prior to completing the sale, GZA did not take soil or groundwater samples, although the Phase I Environmental Site Assessment Report notes that, without doing so, it would be impossible to determine whether the property contained hazardous materials.  See id. at GZA3138; Trial Tr. Morning Day One at 133:1–3.

In December 2017, after Old Gate closed on the property, GZA submitted a Phase II and Phase III Environmental Site Assessment ("Phase II/III Assessment") to Old Gate.  Pl.'s Ex. 41.  As part of the Phase II/III Assessment, GZA collected 198 samples of soil from the Property.  Id. at GZA_REV00000804.  Laboratory tests revealed the presence of extractable total petroleum hydrocarbons ("ETPH"), TCA, PCE, PCBs, arsenic, and chlordane, among other substances.  See, infra.  About one week after GZA completed the Phase II/III Assessment, GZA submitted a Remedial Action Plan ("RAP") to Old Gate.  See Pl.'s Ex 42.  The RAP was designed to comply

with regulations set by the Connecticut Department of Energy and Environmental Protection ("DEEP") in connection with Old Gate's acceptance into DEEP's voluntary remediation program. Trial Tr. Morning Day Two at 120:4–7; Trial Tr. Afternoon Day One at 173:22–175:20. Aside from removing two storage tanks, removing certain contaminated soil, and publishing public notices of Old Gate's plans to remediate the Property in 2017 and 2021, the RAP has not yet been implemented. See Trial Tr. Afternoon Day One at 174:17–20, 179:11–20.

Below is a summary of GZA's findings from the Phase II/III Assessment and suggested RAP.[4]

a.     Areas north and northeast of the manufacturing building

Soil samples collected from the area north of the manufacturing building revealed the presence of ETPH, which exceeded the level considered safe for a property having an industrial or commercial use. See Pl.'s Ex. 42 at GZA_REV00000817–18. This level is referred to as the Industrial/Commercial Direct Exposure Criteria ("I/C-DEC"). See id. at GZA_REV00000811. Samples taken from this area of the Property also contained trace amounts of TCA, PCE, and freon. Id. at GZA_REV00000817–18. In addition, laboratory results showed the presence of arsenic in the soil at a level that exceeded the I/C-DEC. Id. GZA also found chlordane in the soil at a level that exceeded the Pollution Mobility Criteria ("GB-PMC"), which refers to the risk that a soil-based pollutant might migrate to groundwater. Id. at GZA_REV00000811, GZA_REV00000820.

---

[4] The author of these plans, James Henry of GZA, testified during trial that the findings present in the Phase II/III Assessment remained unchanged as of the date of his testimony, May 8, 2025. Trial Tr. Afternoon Day One at 177:16-20.

To the northeast, GZA reported the presence of ETPH in a concentration below the Residential Direct Exposure Criteria ("R-DEC"), and thus, also below the I/C-DEC. See Id. at GZA_REV00000811, GZA_REV00000820–21.  Samples taken from this area contained trace amounts of TCE, PCE, chlordane, and freon.  Id. at GZA_REV00000821.  Lab results also showed the presence of arsenic at a level above the I/C-DEC.  Id. GZA_REV00000820–21.

The RAP suggested that the areas to the north and northeast of the manufacturing building needed to be remediated and that this could be done in a manner that complied with DEEP standards set for a property used for industrial or commercial purposes by excavating soil and placing an environmental land use restriction on the property to render inaccessible unexcavated, but contaminated, soil. See Pl.'s Ex. 42 at GZA15540041.

### b.     Area east of the manufacturing building

This area, directly to the east of the manufacturing building, once contained oil storage tanks and oil-insulated transformers.  See, supra, part II.B.  Laboratory results of soil samples taken near the oil insulated transformers revealed ETPH at a concentration above the I/C-DEC and trace, to low, amounts of TCA, PCE, and PCBs. Pl.'s Ex. 41 at GZA_REV00000844–46.  Soil samples taken near the former location of the 10,000-gallon fuel oil storage tanks similarly revealed ETPH concentrations above the I/C-DEC and concentrations of PCBs above the R-DEC.  Id. at GZA_REV00000833.

The RAP recommended that the areas to the east of the manufacturing building, near the storage tanks and transformers, see, supra, part II.B, could be remediated through soil excavation and an environmental land use restriction.  Pl.'s Ex. 42 at GZA15542, GZA15544.

c.    Area southeast of the manufacturing building

To the southeast of the manufacturing building is the area that once contained the 500-gallon TCA storage tank.  See, supra, part II.B.  Samples taken from this area revealed the presence of ETPH, one sample was above the I/C-DEC and another sample was above the R-DEC but below the I/C-DEC.  Pl.'s Ex. 42 at GZA15541. Samples taken from this area also contained trace amounts of TCA, PCE, TCE, PCBs, and freon.  Pl.'s Ex. 41 at GZA_REV00000824.  GZA also detected arsenic in soil from this area at a level above the I/C-DEC.  Id.  The RAP prepared by GZA called for the use of an environmental land use restriction that would prohibit residential use of the land and prohibit the disturbance of soil in the area to bring this area within compliance with DEEP standards.  See Pl.'s Ex. 42 at GZA15541.

d.    Area south of the manufacturing building

In this area, GZA collected soil samples from around the loading dock, which was south of the manufacturing building.  The soil samples collected from around the loading dock revealed low levels of ETPH and other chemicals, but the level of arsenic exceeded the I/C-DEC.  Pl.'s Ex. 41 at GZA_REV00000853.  The RAP recommended excavating the soil around the loading dock, sealing the area with concrete or asphalt, and using an environmental land use restriction to prevent any disturbance of the sealing material.  Pl.'s Ex. 42 at GZA15544.

e.    Stormwater Management System

The stormwater management system includes drainage structures to the east, south, and west of the manufacturing building.  See Pl.'s Ex. 118 at 33. Soil samples collected from two retention basins to the south of the building revealed the presence of ETPH above the R-DEC and PAHs above the IC-DEC were found in one of the

12

retention basins.  Pl.'s Ex. 41 at GZA_REV00000841.  To the west of the manufacturing

building, soil samples tested positive for high levels of arsenic only a few feet below the

soil near a drainage swale.  See Pl.'s Ex. 118 at 33; Pl.'s Ex. 41 at GZA_REV00000841-

42.  The concentration of arsenic was so high that GZA retained a contractor to remove

10 tons of soil from this area.  Pl.'s Ex. 41 at GZA_REV00000841-42.  The RAP called

for filling the entire drainage system and using an environmental land use restriction to

prevent the disturbance of fill.  Pl.'s Ex. 42 at GZA15543.

f.    Manufacturing Building

GZA detected ETPH below the floor of the manufacturing building that exceeded

the I/C-DEC and also detected the presence of arsenic and chlordane.  Id. at

GZA15542.  Rather than excavate the soil below the manufacturing building, GZA

proposed using an environmental land use restriction to prohibit the removal of the floor

of the building, and thus prevent the disturbance of hazardous materials in that area of

the Property.  Id. at GZA15542.

g.    Railroad Tracks

Laboratory tests revealed the soil near the railroad tracks, which are on the

eastern-most portion of the Property, contained polycyclic aromatic hydrocarbons

("PAHs"), which is a chemical product related to petroleum, above the R-DEC but below

the I/C-DEC.  Id. at GZA15544; Trial Tr. Morning Day Two at 83:21-23.  Results also

revealed the presence of arsenic requiring remediation.  Trial Tr. Morning Day Two at

88:18-23.

3.    Remediation Costs

While GZA addressed its communications, including invoices, to Old Gate, and

while GZA performed its work on behalf of Old Gate, Coastal Distribution of

13

Farmingdale LLC, later renamed Ruterra CDF LLC, paid GZA's invoices.  See Pl.'s Ex. 60; Trial Tr. Morning Day One at 24:18-23; 121:3-13.  Mr. Rutigliano is a member of Ruterra CDF LLC and directed that this entity make payments on behalf of Old Gate. See Pl.'s Ex. 51 at GZA20896; Trial Tr. Morning Day One at 60:13–15, 62:5–15.  Mr. Rutigliano testified that Old Gate would repay the other entities that paid GZA on Old Gate's behalf.  Trial Tr. Morning Day One at 63:7–11.  However, Mr. Rutigliano conceded on cross-examination that no formal loan agreements existed requiring Old Gate to reimburse these other entities for payments made to GZA.  Id. at 122:15–123:3.

Another entity associated with Mr. Rutigliano, Ruterra Jericho, paid Absolute Tank Removal for removing two storage tanks from the Property.  Trial Tr. Morning Day One at 56:8–11, 64:9–12, 121:14–16.  The parties have stipulated that, to date, GZA and Absolute Tank removal have submitted invoices amounting to $187,117.65.  See Stipulations at ¶¶ 45, 49, 50, 52–53, 55, 57, 58, 60–61, 63, 65, 67, 69, 71, 73, 75, 78, 81.

### 4.    Old Gate's Efforts to Sell the Property

Old Gate has received several offers to purchase the Property.  In April 2020, Old Gate received a signed offer to purchase the property from FSI MLFD LLC for $8 million.  Trial Tr. Morning Day One at 104:3–17.  Mr. Rutigliano was under the impression that the purchaser intended to use the property as a warehouse facility.  Id. at 105:10–15.  The offer was contingent on the purchaser's review of the Property's "environmental status."  Def.'s Ex. 154 at OG03540.

Between November 2021 and February 2022, Brookfield Asset Management ("Brookfield") expressed interest in purchasing the Property.  Trial Tr. Morning Day One at 105:20–23.  While discussions with Brookfield were ongoing, Mr. Rutigliano asked

14

Mr. Henry to provide an estimate of how much it would cost to voluntarily remediate the property.  See Def.'s Ex. 166. In a draft letter dated December 9, 2021, Mr. Henry estimated the total cost to remediate the property would range from $228,000 to $292,000.  Id. at GZA20880.  Brookfield presented Mr. Rutigliano with a signed Letter of Intent to purchase the Property for $23,000,000.  Trial Tr. Morning Day One at 119:8–120:12.  As a condition of the offer, Old Gate would have been required to complete the "physical site work," such as excavating soil, as part of remediating the Property.  See id. at 120:13–21.

Despite Brookfield's Letter of Intent, the Property was not sold.  Id. at 120:22–121:2.  Mr. Rutigliano testified that he came to the conclusion that Brookfield was not genuinely interested in purchasing the property.  Id.at 130:9–17.

## III.    CONCLUSIONS OF LAW

The claims and counterclaims litigated during the instant bench trial all arise under CERCLA.  The Second Circuit has explained "CERCLA is a 'broad remedial statute' that was designed to ensure "those responsible for any damage, environmental harm, or injury from chemical poisons bear the costs of their actions."  B.F. Goodrich v. Betkoski, 99 F.3d 505, 514 (2d Cir. 1996) (quoting S.Rep. 848, 96th Cong., 2d Sess. 13 (1980) (Senate Report)).  Because of the remedial nature of CERCLA, it "should be construed liberally to give effect to its purposes," such as "facilitating efficient responses to environmental harm, [and] holding responsible parties liable for the cleanup[.]"  Id. (citation omitted).

CERCLA was enacted in 1980 "in response to the serious environmental and health risks posed by industrial pollution."  Burlington N. & Santa Fe Ry. Co. v. United States, 556 U.S. 599, 602 (2009).  It was amended by the Superfund Amendments and

15

Reauthorization Act of 1986 ("SARA"), Pub.L. No. 99–499, 100 Stat. 1613, 1647–4. The statute, as amended, "provides a right of cost recovery in certain circumstances, [section] 107(a), and separate rights to contribution in other circumstances," such as under section 113(f)(1).  United States v. Atl. Rsch. Corp., 551 U.S. 128, 138 (2007).  "A [section] 107(a) action allows the plaintiff to pass off all response costs to any defendant found liable.  However, if the plaintiff itself is liable, the defendant can 'blunt any inequitable distribution of costs by filing a [section] 113(f)[(1)] counterclaim."  Yankee Gas Servs. Co. v. UGI Utilities, Inc., 852 F. Supp. 2d 229, 240 (D. Conn. 2012) (quoting Atl. Rsch. Corp., 551 U.S. at 140).  Thus, when a claim arising under section 107(a) is met with a counterclaim arising under section 113(f)(1), "the action [is] effectively converted into an allocation of costs made on the basis of 'such equitable factors as the court determines are appropriate.'"  Id. (quoting 42 U.S.C. § 9613(f)(1))).

In the instant case, Old Gate seeks to recover costs pursuant to section 107(a), and Paddock seeks contribution under section 113(f)(1).  See, supra, part I.  Both parties also seek declaratory relief.  Id. The court will consider whether the parties are liable under sections 107(a) and 113(f)(1), respectively.  If the parties are both liable, the court will then consider how to equitably allocate costs between Old Gate and Paddock, including how to structure any declaratory relief.

A.    Old Gate's Section 107(a) Claim for Response Costs

Section 107(a) of CERCLA imposes strict liability for environmental contamination.  BNSF, 556 U.S. at 608.  To establish its prima facie case under this section of CERCLA, Old Gate must prove: (1) Paddock was "within one of the four categories of responsible parties enumerated by section 9607(a); (2) the [Property] is a facility as defined in [section] 9601(9); (3) there is a release or threatened release of

16

hazardous substances at the facility; (4) the plaintiff incurred costs responding to the release or threatened release; and (5) the costs and response actions conform to the national contingency plan ("NCP").  B.F. Goodrich, 99 F.3d at 514.

The parties have stipulated that the Property is a "facility," as defined by section 9601(9), and that there has been a release of hazardous substances at the facility. Stipulations at ¶¶ 7–8.  Thus, the court must consider whether Old Gate has proven the first, fourth, and fifth elements of its section 107(a) claim.

        1.      Potentially Responsible Party

Section 9607(a) defines four categories of potentially responsible parties ("PRPs") that may be liable under CERCLA.  See 42 U.S.C. § 9607(a).  Among those categories is "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of[.]" Id. (emphasis added).  There is no dispute that Paddock is the successor-in-interest of O-I and that O-I operated a facility on the Property for approximately a decade.  See Stipulations at ¶¶ 25–26.  The only dispute as to this element of Old Gate's section 107(a) claim is whether a disposal of any hazardous substance occurred while O-I operated a facility on the Property.  CERCLA defines "disposal" to include "dumping, spilling, leaking, or placing of any . . . hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment."  42 U.S.C. § 9601(29) (defining disposal by reference to section 1004 of the Solid Waste Disposal Act, 42 U.S.C. § 6903).  "When determining CERCLA liability, there is nothing objectionable in basing findings solely on circumstantial evidence, especially where the passage of time has made direct evidence difficult or impossible to

obtain." <u>Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.</u>, 596 F.3d 112, 131 (2d Cir. 2010).

Mindful of <u>Niagara</u>, the court finds by a preponderance of evidence that disposal of hazardous substances did occur on the Property while O-I operated its facility. Indeed, there is evidence waste oil was spilled or leaked onto the ground while O-I leased the Property. <u>See</u>, <u>supra</u>, part II.C. Further, the court finds that O-I used 5,500 gallons of TCA, a hazardous substance under CERCLA, annually as part of its operation of the facility on the Property. <u>See id</u>; 40 C.F.R. § 302.4 (listing 1,1,1-Trichloroethane, what the court refers to as TCA, as a hazardous substance). The court finds persuasive a Report prepared by ESI in 1990, only a few years after O-I ceased its operation on the Property, <u>supra</u>, part II.B, which Report concluded that the TCA used by O-I became mixed with waste hydraulic oil and that this tainted oil was disposed of by O-I on the property via spillage and leaking. <u>See id</u>.[5] The court is also persuaded by testimony of Mr. Henry, whom the court assessed to be qualified and credible, that O-I is responsible, at least in part, for the disposal of TCA onto the property. Trial Tr. Afternoon Day One at 208:1–213:1.

With respect to arsenic, Mr. Henry testified that Paddock's predecessor, O-I, used an algicide in treating the non-contact cooling water contained in the chilling towers and that algicide commonly contained arsenic. Trial Tr. Morning Day Two at 14:5–10; 86:13–17. Further, Mr. Henry testified that O-I used pesticides as part of its

---

[5] Importantly, while oil alone is not considered a hazardous waste under CERCLA, oil that is tainted with a hazardous waste is covered under CERCLA. <u>E.g.</u>, <u>Cooper Crouse-Hinds, LLC v. City of Syracuse, New York</u>, 568 F. Supp. 3d 205, 238 (N.D.N.Y. 2021) ("The [petroleum] exclusion does not apply to waste petroleum that has been contaminated with an additional hazardous substance during or after its use."); <u>City of New York v. Exxon Corp.</u>, 766 F. Supp. 177, 187-88 (S.D.N.Y. 1991) (a production process that resulted in contaminants being added to a petroleum emulsion meant that the defendant could not assert the CERCLA petroleum exclusion).

operation, which commonly contained arsenic.  See id. at 86:24–87:4.[6]  The court finds, based on Mr. Henry's testimony, that the arsenic on the property is likely attributable to O-I's operation.  See, e.g., id. at 208:17–211:18.

As for chlordane, Mr. Henry testified that O-I hired a contractor to spray pesticides around the perimeter of its building and explained that chlordane is an ingredient found in some pesticides.  See Trial Tr. Afternoon Day One at 205:16–21, 215:6–16.  By contrast, ATI, was only known to have used or handled one pesticide on the property, Baygon, which did not contain chlordane.  See Trial Tr. Morning Day Two at 39:18–40:6; Trial Tr. Afternoon Day Two at 217:4–13.  On this basis, the court finds Mr. Henry's testimony credible that the chlordane present on the property likely occurred in connection with O-I's application of pesticides.  Trial Tr. Afternoon Day One at 208:1–23; 211:19–213:1, 215:6–16.

Regarding PCBs, Mr. Henry testified, and documentary evidence supports, the conclusion that several transformers on the Property contained PCBs.  Trial Tr. Morning Day Two at 10:15–11:20; Pl.'s 115A Ex. at OI_OG00000705.  The court credits Mr. Henry's expert testimony that it is likely the PCBs detected on the property are attributable to releases from the transformers.  The court finds by a preponderance of evidence that such a release occurred while O-I operated on the property.  See, supra, part II.B, part II.C.2.b (describing the transformers).

Turning to PCE, testimony and documentary evidence supports a finding that O-I used PCE as part of its operations on the Property and, that like TCA, PCE became mixed with waste oil that spilled and leaked onto the soil while O-I operated on the

---

[6] While Mr. Henry testified that ATI produced a pesticide, Baygon, he testified that Baygon did not contain arsenic.  Trial Tr. Afternoon Day One at 205:5–15.

Property.  <u>See</u> Trial Tr. Afternoon Day One at 190:5–23; Trial Tr. Morning Day Two at 46:16–18; Pl.'s Ex. 23 at OI_OG00001806.  The court finds by a preponderance of evidence that this release occurred while O-I operated on the Property.

Finally, PAHs were also detected on the property, such as near the train tracks.  Mr. Henry testified that it was his expert opinion that the presence of PAHs on the property can be attributed to O-I.  <u>See</u> Trial Tr. Morning Day Two at 83:19–84:9; 87:12–16.  In evaluating Mr. Henry's conclusion, the court finds persuasive the fact that plastic pellets, used by O-I in their manufacturing process, were also found around the train tracks during GZA's inspection of the property.  <u>Id.</u> at 15:20–16:7.  Based on this circumstantial evidence and Mr. Henry's credible testimony, the court finds that O-I is responsible for the release of PAHs on the Property.

Because TCA, arsenic, chlordane, PCE, PCBs, and PAHs are all considered hazardous materials under CERCLA, <u>see</u> 40 C.F.R. § 302.4, and because the court finds O-I disposed of these materials in connection with its operation of a facility on the Property, the court concludes that Old Gate has satisfied the first element of its section 107(a) claim.

2.    Costs Incurred by Old Gate

Section 107(a) permits Old Gate to recover costs it incurred in connection with its efforts to remediate the property.  This court has previously explained that "[c]ourts inside and outside of this Circuit have held that the term 'incurred' can encompass not only costs that a plaintiff paid directly, but also costs that a plaintiff has an existing legal obligation to pay."  Ruling on Partial Motion for Summary Judgment (Doc. No. 167) at 9 (collecting cases).  In its prior Ruling, this court held Old Gate "may satisfy the 'incurred

costs' element by demonstrating an existing legal obligation to pay response costs." <u>Id.</u>
at 14

The court concludes that Old Gate has proven it incurred cleanup costs because
Old Gate has established it was legally obligated to pay for such costs.  For example, a
Proposal for Services prepared by GZA was signed by Mr. Rutigliano in his capacity as
Managing Member of Old Gate LLC.  Def.'s Ex. 134 at OG0558.  The Proposal includes
a fee schedule, which Old Gate became obligated to pay when Mr. Rutigliano signed
the Proposal.  <u>See id.</u> OG0558–OG0559; <u>see</u> <u>also</u> Pl.'s Ex. 60 at OG0492-93 (reflecting
a signed proposal for assistance with entry into the Abandoned Brownfield Cleanup
Program describing GZA's billing practices and including Mr. Rutigliano's signature as
Managing Member of Old Gate LLC).  While it is true that other entities paid for cleanup
services rendered on Old Gate's behalf, <u>see</u>, <u>supra</u>, Part II.C, this does not negate Old
Gate's legal obligation to ensure that the providers of the cleanup services received
payment.  Accordingly, the court concludes that Old Gate has satisfied this element of
its section 107(a) claim.

3.    Necessary Costs in Conformity with NCP

Old Gate can recover only those costs that are necessary to clean up the
Property.  The Second Circuit has explained that the phrase "necessary response
costs" should be "liberally construed under CERCLA," and that such costs include those
incurred to 'contain a release threatening the public health or the environment.'" <u>W.R.</u>
<u>Grace & Co.-Conn. v. Zotos Int'l, Inc.</u>, 559 F.3d 85, 92 (2d Cir. 2009) (quoting <u>Amoco</u>
<u>Oil Co. v. Borden Inc.</u>, 889 F.2d 664 (5th Cir.1989)).

The court concludes that Old Gate has incurred necessary response costs.
These costs stem from McCarter & English's work in assisting Old Gate with

environmental work connected with the Property, and GZA's work in preparing various site assessment reports and the remedial action plan, GZA's supervision of Absolute Tank Removal's work to remove two storage tanks, and GZA's testing of the soil to make sure the soil was safe following the removal of one of the tanks.  See, supra, part II.C.2–3.  The court concludes that these costs are "necessary" because they relate to Old Gate's efforts to protect the public and the environment from hazardous materials present on the property.

The court concludes further that some costs associated with certain of Absolute Tank Removal's work amount to necessary response costs.  Absolute Tank Removal removed two tanks in 2021.  Pl.'s Ex. 48 at OG03079.  The first was a 275-gallon underground diesel fuel storage tank on the western portion of the property.  Pl.'s Ex. 46 at OG0374.[7]  GZA recommended in its RAP that this 275-gallon tank should be removed so that soil samples could be taken to confirm that the soil surrounding the tank did not contain hazardous substances.  See Pl.'s Ex. 42 at GZA15543.  This recommendation followed an earlier environmental report prepared by GZA that identified the area near this diesel fuel storage tank as an area of concern.  See Pl.'s Ex. 36 at GZA3124.  Accordingly, the court concludes that costs to remove this tank, which the court finds totaled $1,542, were "necessary" under CERCLA to protect the public and environment from the threat of hazardous materials.[8]

---

[7] Absolute Tank Removal sometimes refers to this tank as a 125-gallon tank.  See, e.g., Pl.'s Ex. 48 at OG03079.  The court understands Absolute Tank Removal's reference to a 125-gallon tank to be a typographical error because reports prepared by various environmental consultants consistently refer to this tank as a 275-gallon tank.  E.g., Pl.'s Ex. 4 at OI_OG00000548; Pl.'s Ex. 24 at OI_OG00005841; Pl.'s Ex. 42 at GZA15543.

[8] The court arrives at this figure by adding $1,200, Absolute Tank Removal's quote to remove the 275-gall tank, to $250, the Fire Marshal permit fee, and then including Connecticut sales tax of 6.35%.  Pl.'s Ex. 46 at OG03075.

Absolute Tank Removal removed a second tank; the court concludes that costs to remove this tank were not necessary under CERCLA. Absolute Tank describes this second tank as a 6,500-gallon aboveground diesel fuel storage tank. Pl.'s Ex. 46 at OG0375. Mr. Rutigliano described this tank the same way during his testimony. Trial Tr. Morning Day One at 121:24–122:2. However, none of the many voluminous environmental reports the court has reviewed describe such a tank. See, e.g., Pl.'s Ex. 42 (describing only one diesel storage tank, a 275-gallon tank, without mentioning a 6,500-gallon tank of any kind). Rather, GZA described the presence of four aboveground storage tanks, three of which were removed prior to 2016 and one of which remained on the site as of 2016. Pl.'s Ex 44 at OI_OG00007147. This remaining tank, according to the GZA report, was a 10,000-gallon aboveground number 2 fuel oil storage tank.[9] Id. GZA concluded in its RAP that no remedial action was necessary as to this 10,000-gallon aboveground storage tank, which Absolute Tank removed. See Pl.'s Ex. 42 at GZA1553. Accordingly, the court concludes that the costs Old Gate incurred to remove this second tank, which the court finds amounted to $5,270.27, were not "necessary" pursuant to CERCLA.[10]

Having concluded that Old Gate incurred necessary response costs, the court must also consider whether Old Gate has proven by a preponderance of evidence that the costs incurred are in conformity with the NCP. The NCP is "[t]he federal government's toxic waste playbook[;]" the Plan provides "steps the government must

---

[9] The court finds that Absolute Tank's description of this tank as a 6,500-gallon diesel storage tank is erroneous.

[10] The court reaches this figure by taking $6,812.27, the total amount invoiced by Absolute Tank, Stipulations at ¶ 81, and subtracting from that amount the $1,542, which the court found was necessary under CERCLA. See, supra, at 21–22.

take to identify, evaluate, and respond to hazardous substances in the environment."

Niagara Mohawk Power Corp., 596 F.3d at 136.  A private party responding to a

hazardous release can demonstrate its compliance with the NCP by undertaking a

"response under the monitoring, and with the ultimate approval, of the state's

environmental agency."  Id.  That an entity can be said to comply with the NCP in this

way is because the state has the authority to settle CERCLA liability without the express

approval of the EPA.  Id.

An October 19, 2017 letter from DEEP to Old Gate confirms receipt of an

Environmental Condition Assessment Form, which Old Gate was required to provide;

the letter provides that, pursuant to state regulations, DEEP automatically delegates

oversight of the remediation at issue to a licensed environmental professional ("LEP").

Pl.'s Ex. 40.  Thus, DEEP delegated its oversight authority to Old Gate's LEP, Mr.

Henry.  See id.  Although Mr. Henry offered no opinion as to whether his work was

compliant with the NCP, Mr. Henry did testify that the remediation plans he prepared

complied with Connecticut's environmental cleanup standards.  Trial Tr. Morning Day

Two at 121:21–122:4, 131:9–16.  Mr. Henry's testimony is bolstered by the court's own

review of site assessment reports, remedial action plan, and public notices prepared by

GZA, see, supra, part II.C.2, which comply with the applicable environmental

regulations issued by DEEP.  See R.C.S.A §§ 22a-133k-1–3.  Accordingly, the court

concludes that the necessary remediation costs thus far incurred, which amount to

$207,600.88, comply with the NCP.[11]

---

[11] The court reaches this figure by summing the costs associated with invoices submitted by GZA,
which amount to $180,305.38, including a $30,000 retainer; the necessary response costs associated
with Absolute Tank Removal's work, $1,542; and the costs associated with invoices submitted by
McCarter & English for environmental services, which total $25,753.50.  See Stipulations at ¶¶ 45, 49, 50,

*        *                *

Having concluded that a release of hazardous material occurred on the Property while Paddock's predecessor operated a facility thereon, and having concluded that Old Gate incurred response costs that were necessary and in conformity with the NCP, the court concludes that Old Gate has established a <u>prima</u> <u>facie</u> case under section 107(a) of CERCLA.

### 4. Paddock's Affirmative Defenses

Paddock presses three affirmative defenses in response to Old Gate's section 107(a) claim. First, Paddock asserts the third-party defense available under CERCLA. <u>See</u> Amended Joint Pretrial Memorandum at 9. Second, Paddock argues that at least certain of the hazardous materials present on the property cannot be attributed to Paddock and, thus, apportionment is appropriate. <u>Id.</u> Third, Paddock asserts that, in the event the court determines response costs should be allocated, it should only be required to contribute its equitable share. <u>Id.</u>

The court will address Paddock's first and second affirmative defenses here. The court will discuss the equitable allocation of response costs in a later section of this Ruling. <u>See</u>, <u>infra</u>, part III.C.

### a. Third-Party Defense

The third-party defense in CERCLA shields an otherwise liable party, here Paddock, from liability. 42 U.S.C. § 9607(b). This third-party defense applies only when the defendant proves by a preponderance of evidence that "the release or threat of release of a hazardous substance and the damages resulting therefrom were caused

---

52-53, 55, 57, 58, 60-61, 63, 65, 67, 69, 71, 73, 75, 78; Trial Tr. Morning Day One at 41:11-15; <u>see</u>, <u>supra</u> at 21–22.

25

solely by an act or omission of a third party." Id. (emphasis added). In such cases, the defendant can avoid liability if: (1) the third-party responsible for the release was not an employee or agent of the defendant; (2) the defendant "exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances; and (3) the defendant "took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions[.]" 42 U.S.C. § 9607(b)(3).

The court finds that Paddock has failed to establish by a preponderance of evidence that the release of hazardous materials on the property was caused solely by a third party. The court reaches this finding having considered all of the evidence presented at trial. In so doing, the court is unpersuaded by Paddock's expert witness, Nicholas Hastings, who testified that it could not be concluded that O-I, Paddock's predecessor, was responsible for at least some of the releases of hazardous substances present on the Property. See Trial Tr. Afternoon Day Two at 172:11–19. The court instead finds the testimony of Old Gate's expert witness, Mr. Henry, persuasive. Mr. Henry explained in a clear and credible manner that, while he could not totally eliminate the possibility that another party was responsible for at least some of the release of hazardous materials on the property, it was highly likely that O-I was responsible for at least some of the contamination. See Trial Tr. Afternoon Day One at 208:20–22, 212:23–24, 216:21–217:1.

In providing this opinion, Mr. Henry cited to much of the documentary evidence that the court has reviewed and finds persuasive. The court is especially persuaded by

environmental reports prepared by the Connecticut Department of Environmental Protection and consultants suggesting that O-I, Paddocks' predecessor, used hazardous substances like TCA as part of its maintenance of molding machines in the manufacturing building, and that the waste hydraulic oil from these molding machines likely contained these hazardous substances, which were introduced into the soil of the Property through spills and leaks of waste oil.  See, supra, part II.B, part III.A.1. Because Paddock has failed to prove by a preponderance that a third party was solely responsible for the hazardous substances, it cannot avail itself of the CERCLA third-party defense to Old Gate's section 107(a) claim.

### b.    Divisibility Defense

While section 107(a) imposes strict liability, "Congress intended the scope of liability to be determined from traditional and evolving principles of common law." BNSF, 556 U.S. at 613.  In accordance with traditional principals of tort law, to avoid joint and several liability, a defendant may invoke the common law doctrine of divisibility to prove "that the harm is divisible and there is a reasonable basis for apportionment." APL Co. Pte. v. Kemira Water Sols., Inc., 999 F. Supp. 2d 590, 624 (S.D.N.Y. 2014) (citing BNSF, 556 U.S. at 614-15).  "Proving divisibility is a very difficult proposition, requiring concrete and specific evidence of causation of separate and distinct harms to the environment."  Durham Mfg. Co. v. Merriam Mfg. Co., 294 F. Supp. 2d 251, 267 (D. Conn. 2003) (internal citation and quotation marks omitted); see also APL Co., 999 F. Supp. 2d at 626 ("Given the nature of hazardous waste disposal, rarely if ever will a PRP be able to demonstrate divisibility of harm, and therefore joint and several liability is the norm under CERCLA." (cleaned up)).

Paddock argues that its predecessor, O-I, has no connection with certain hazardous materials found on the Property, making apportionment appropriate.  Def.'s Findings of Fact and Conclusion of Law (Doc. No. 202-1), Conclusions of Law at ¶ 80. Specifically, Paddock maintains that there is no evidence that, other than TCA, it ever disposed of volatile organic compounds ("VOCs") such as arsenic, chlordane, PCBs, or PAHs.  Id. at ¶¶ 81–89.  However, the court has already found that O-I is responsible for releasing these chemicals onto the Property and disagrees with Paddock's argument that there no evidence linking Paddock's predecessor to the chemicals at issue.  See, supra, part III.A.1.  While there may be no direct evidence that O-I used all of the chemicals at issue, there is ample circumstantial evidence that O-I used these products and that releases of these products occurred while O-I operated its facility on the Property.  See, supra, part III.1.  Accordingly, the court concludes that the harms at issue are not divisible, and thus apportionment is inappropriate.

B.    Paddock's Section 113(f)(1) Contribution Claim

Congress amended CERCLA in the Superfund Amendments and Reauthorization Act of 1986.  See, supra, part III.  In so doing, it added section 113(f), which allows a defendant found liable under section 107(a) to "blunt any inequitable distribution of costs by filing a [section] 113(f) counterclaim."  United States v. Atl. Rsch. Corp., 551 U.S. 128, 140 (2007).  Section 113(f) does this by creating "a contribution right for parties liable or potentially liable under CERCLA."  Consol. Edison Co. of New York v. UGI Utilities, Inc., 423 F.3d 90, 95 (2d Cir. 2005).  Because the court has concluded Old Gate has met is burden of persuasion as to its section 107(a) claim, it is now Paddock's burden to show that Old Gate is liable under section 113(f)(1).  "The elements of an action under [section] 113(f)(1) are the same as those under [section]

107(a)."  Bedford Affiliates v. Sills, 156 F.3d 416, 427 (2d Cir. 1998).  Thus, Paddock

must establish that Old Gate is a potentially responsible party; the site is a facility; there

has been a release, or threatened release of hazardous substances at the facility; the

plaintiff incurred costs responding to the release; and, those costs conform to the NCP.

42 U.S.C. § 9607(a); see also Bedford, 156 F.3d at 427.

Old Gate is the current owner of the Property, on which the court has found a

hazardous release occurred.  The court has also found that the site is a facility, that

response costs have been incurred, and that those costs conform to the NCP.

Accordingly, Paddock has established a prima facie claim under section 113(f)(1) of

CERCLA.

### 1.    Bona Fide Prospective Purchaser

Old Gate raises several affirmative defenses in an effort to avoid liability under

section 113(f)(1).  The first such defense is that Old Gate argues it is protected from

liability as a bona fide prospective purchaser.  Joint Pretrial Memorandum at 6.  "To

encourage investment in and restoration of contaminated lands, Congress provided a

complete defense to liability for parties who would otherwise face liability solely by virtue

of acquiring and thus owning or operating on contaminated land."  Von Duprin LLC v.

Major Holdings, LLC, 12 F.4th 751, 769 (7th Cir. 2021).  This is known as the bona fide

prospective purchaser ("BFPP") defense.  See 42 U.S.C. §§ 9601(40), 9607(q)(1)(C).

Under this defense, and as relevant to the instant case, Old Gate must establish by a

preponderance that (1) all disposals of hazardous substances occurred before it

acquired the property; (2) Old Gate "made all appropriate inquiries into the previous

ownership and uses of the facility in accordance with generally accepted good

commercial and customary standards and practices" as defined by CERCLA; (3) Old

29

Gate provided "all legally required notices with respect to the discovery or release of any hazardous substances at the facility;" and (4) Old Gate took reasonable steps to "stop any continuing release, prevent any threatened future release, and prevent or limit human, environmental, or natural resource exposure to any previously released hazardous substance.  See 42 U.S.C. § 9601(40)(B).

The court concludes that Old Gate cannot avail itself of the BFPP defense because it has failed to establish by a preponderance of evidence that no disposal of hazardous substances occurred after it acquired the property in June of 2017.  In reaching this conclusion, the court is mindful that CERCLA defines "disposal" to include "leaking."  See 42 U.S.C. § 9601(29) (defining disposal by reference to section 1004 of the Solid Waste Disposal Act, 42 U.S.C. § 6903).  The court notes that, two 25,000-gallon storage tanks to the east of the property were still buried underground after Old Gate acquired the property.  See Pl.'s Ex. 42 at GZA115542.  While a 1984 report prepared by Day Engineering concluded that the tanks were empty, the same report also observed that pipes connected to the tanks contained a measurable amount of TCA.  Pl.'s Ex. 84 at OI_OG00000912, OI_OG00000915.  A letter prepared by GZA to DEEP, dated December 13, 2017, months after Old Gate acquired the property, explained that to the northeast of the building are "several vent and fill pipes protruding from [a concrete pad].  These pipes are associated with two (2) 25,000-gallon alcohol USTs that were reportedly abandoned in place prior to 1976."  See Pl.'s Ex. 44 at OI_OG7169.  Further, soil collected from the area north, northeast, and east of the manufacturing building, revealed the presence of trace amounts of TCA.  See, supra, part II.C.2.a–b.  Finally, Mr. Henry reasonable testified that, while the presence of TCA

could be attributed to O-I in part, the court did not understand him to mean that only O-I
was responsible for the presence of TCA in the soil.  <u>See</u> Trial Tr. Afternoon Day One at
208:20–23.  Accordingly, the court concludes the Old Gate has failed to establish by a
preponderance that a disposal did not occur during its ownership of the property.  If
anything, it appears more likely than not that at least some amount of TCA leaked into
the soil during Old Gate's ownership of the property, which began on June 2, 2017.  For
this reason, Old Gate cannot avail itself of the BFPP defense.

2.    Remaining Defenses

The court need not linger on Old Gate's remaining defenses, which Old Gate
claims to assert as part of the parties' Joint Pretrial Memorandum.  <u>See</u> Joint Pretrial
Memorandum at 6.  Because Old Gate has failed to establish that releases of
hazardous materials are attributable exclusively to third parties, it cannot avail itself of
the third-party defense.  <u>See</u> 42 U.S.C. § 9607(b); <u>see</u> <u>also</u>, <u>supra</u>, part III.A.4.

As for Old Gate's divisibility defense, <u>see</u>, <u>generally</u>, <u>supra</u>, at part III.A.4.b, the
court is aware of no evidence admitted at trial suggesting that the harms caused by the
releases of hazardous substances attributable to Old Gate are somehow divisible from
the harms caused by the releases attributable to others.  Accordingly, the court finds
that Old Gate has failed to establish by a preponderance that this affirmative defense
applies.

With respect to Old Gate's assertion that Paddock's claims are barred because it
failed to comply with certain requirements of recovery and that Paddock's claims are
barred because Old Gate did not violate CERCLA, the court is similarly aware of no
evidence supporting these assertions.  Indeed, in Old Gate's Proposed Findings of Fact
and Conclusions of Law, the only affirmative defense Old Gate asserts in any detail is

its BFPP defense, which it did not prove.  See Pl.'s Findings of Fact and Conclusions of

Law (Doc. No. 203), Conclusions of Law at ¶¶ 49–51.

      C.      Equitable Allocation of Past and Future Response Costs

Having concluded that Paddock is liable to Old Gate under section 107(a) and

Old Gate is liable to Paddock under section 113(f)(1), the court must now allocate

response costs among the parties.  See 42 U.S.C. § 9613(f)(1).  In doing so, "the court

may allocate response costs among liable parties using such equitable factors as the

court determines are appropriate."  Id.  As the Second Circuit recently wrote, "the statute

does not require district courts to consider or give weight to any particular allocation

factor, but rather permits the court to determine which factors are most relevant to a

given case." MPM Silicones, LLC v. Union Carbide Corp., 966 F.3d 200, 236 (2d Cir.

2020), (Aug. 13, 2020).  Indeed, "the Second Circuit has declined to compile a

mandatory list of factors for consideration" when allocating response costs. Yankee

Gas, 852 F. Supp. 2d at 246.  Rather, CERLA instead "affords a district court broad

discretion to balance the equities in the interests of justice."  Bedford Affiliates, 156 F.3d

at 429.  The allocation decision is reviewed for abuse of discretion. MPM Silicones, 966

F.3d 200 at 236.

There are generally two sets of factors available to the courts to consider when

allocating response costs.  The first set are known as the Gore Factors; the second, and

the set of factors this court will use, are the Torres Factors.[12]  Pursuant to the Torres

---

[12] The court adopts the Torres Factors guided by Judge Kravitz's opinion in which he explained, "the Gore factors are most relevant in academic and theoretical analysis of the way Superfund liabilities should be allocated.  But in the real world Judge Torres' list of four critical factors often provides the basis upon which Superfund allocations are made."  Yankee Gas, 852 F. Supp. 2d at 247 (internal quotation marks omitted).

factors, courts allocate response costs based on: (1) "The extent to which cleanup costs are attributable to wastes for which a party is responsible;" (2) "The party's level of culpability;" (3) "The degree to which the party benefitted from disposal of the waste;" and (4) "The party's ability to pay its share of the cost." United States v. Davis, 31 F. Supp. 2d 45, 63 (D.R.I. 1998).  There is no dispute as to the parties' ability to pay; thus, the court will consider the three remaining factors in allocating response costs.

        1.      Waste Attributable to Each Party

Allocating costs on the basis of waste is challenging in light of the evidence presented at trial.  For instance, in Davis, the court allocated costs on the basis of the quantity of hazardous materials disposed of on the property.  Id. at 64.  Here, the court is aware of no reliable evidence upon which it could allocate costs on the basis of volume of hazardous materials introduced into the Property.  What is known, however, is the approximate length of time O-I operated on, and Old Gate owned, the Property. In apportioning liability, the court will consider the period of time that O-I and Paddock have occupied or owned the property, albeit it is not a very significant factor.  Paddock's predecessor, O-I, operated a facility on the property from 1976 until at least 1987, 11 years, and Old Gate has owned the property from 2017 to present, 8 years. Stipulations ¶¶ 26, Trial Tr. Morning Day One at 36:10–23.   While other parties, ATI among them, operated on, or held an interest in the property in the years preceding 1976 and after 1987, the court has not made a finding that these other parties are responsible for the hazardous materials on the Property.  Thus, the court does not include these periods in allocating responsibility.

2.    Level of Culpability

On the basis of the admissible evidence presented at trial, the court concludes that Paddock, as O-I's successor-in-interest, is significantly more culpable for the introduction of the hazardous materials than Old Gate.  First, and most important, in its operation of a commercial enterprise on the site, there is ample evidence to show that O-I economically benefited from its use of the hazardous materials at issue.  For example, O-I used TCA and PCE to clean its hydraulic molding machines, and it used an algaecide containing arsenic to ensure the operation of its cooling towers.  See, supra, part II.B–C, part III.  Second, O-I should have been aware that it was introducing hazardous materials during its operation of the site.  Multiple environmental reports discuss the presence of significant staining throughout the property, some of which was waste oil that likely contained hazardous substances, and yet there is no evidence that O-I made significant changes to its operation in order to prevent this staining.  See, supra, part II.B–C.  In contrast, the court finds that Old Gate, compared to O-I, is significantly less culpable.  The court has concluded that some release of hazardous materials occurred during Old Gate's ownership.  See, supra, part III.A.1.  While it did not undertake significant remediation, however, it is minor compared to O-I. Further, it is Old Gate that is attempting to remediate the property after years of neglect.  Finally, Old Gate did not operate a facility on the property for its benefit.  See, supra, part II.C.

Accordingly, the court concludes that an equitable allocation of response costs requires that Paddock's share of such costs be substantial, to account for its level of culpability as O-I's successor-in-interest, and to reflect Old Gate's comparatively minor level of culpability.

### 3.    Degree of Benefit

The last factor the court will consider is degree of benefit.  There are a variety of rationales for allocating some portion of cleanup costs to the present owner.  These rationales include recognition that the present owner purchased the property knowing it was contaminated, or that the present owner should be liable "simply by virtue of being the landowner."  United States v. R.W. Meyer, Inc., 932 F.2d 568, 571 (6th Cir.1991).  Here, the court notes that any benefit of cleanup of the property will redound exclusively to Old Gate.  However, balanced against that is public policy which seeks to encourage purchase of these contaminated properties that leads to cleanup.  See DMJ Assocs., L.L.C. v. Capasso, 2015 U.S. Dist. LEXIS 177460, at *102 (E.D.N.Y. July 6, 2015). (citing among public policy considerations the expeditious cleanup of hazardous waste).

There is some dispute as to what exactly Old Gate will do with the property once remediated. See, infra, part III.C.4.  However, based on offers received by Mr. Rutigliano in his capacity as Managing Member of Old Gate, it appears that buyers would be interested in acquiring the property so long as it is remediated.  See, supra, part II.C.4.  Of course, O-I benefited from its occupation of the property: it operated a business, making products it sold, over an 11 year period. However, the court has before it no evidence of how profitable this business was.  The court weighs this factor primarily against Old Gate.

### 4.    Torres Factors Overall

Given that ability to pay is not a factor, the court views culpability as the most significant of the remaining three factors.  The record is very clear that O-I is responsible for nearly all of the contamination on the site.  The remaining two factors

play a lesser role in this court's determination of responsibility for incurred and costs to be incurred to remediate the contamination.

The waste attributable factor here, as considered by the court at this time, is relatively ineffective in determining responsibility. Old Gate has delayed clean up, taking only a few steps to prevent continued contamination. On the other hand, it is its 11 years occupying the property, O-I continuously created almost all the contamination at the property.

Lastly is the factor of benefit: who will benefit from the remediation. Clearly, Old Gate will, not Paddock. While it is a factor that warrants consideration, the court does not judge it to be very significant. First, the court, notes there is not a great record on the likely value of the property as remediated.[13] Further, it is uncertain this is a benefit Old Gate has realized, and it will realize for some time. Although not a substantial one, this factor supports assigning some responsibility to Old Gate. Yankee Gas Servs. Co. v. UGI Utilities, Inc., 852 F. Supp. at 248. (courts will frequently assign an owner's share of remediation costs as simply the current landowner).

Having considered the Torres factors, the court concludes that the allocation of cleanup costs should be: Old Gate, 5% and O-I (Paddock), 95%.[14]

5.    Standard of Remediation

The court must address whether it is equitable for Paddock to be required to pay for response costs to remediate the property to a residential standard or to an

---

[13] Neither party offered a current valuation of the property. Trial Tr. Afternoon Day Two at 145:1-2; Trial Tr. Day Three at 39:12-13.

[14] The court notes that neither in their pre-trial submissions nor during trial did the parties argue for an allocation percentage. The court inquired at the completion of trial if the counsel wished to do further briefing. They declined. Trial Tr. Afternoon Day Two at 228:17–25, 229:1-5.

industrial/commercial standard.  This is a relevant consideration because the Property is presently zoned for industrial or commercial use.  Trial Tr. Day Three at 40:7–12. However, the court understands that Old Gate may now seek to remediate the property to a residential standard, and thus avoid applying a land use restriction to the Property, like the ones discussed in GZA's RAP.  See, supra, part II.C.2.

During trial, Paddock presented an expert witness, Michael Hedden, who testified that the highest and best use of the property called for a commercial or industrial use. Trial Tr. Afternoon Day Two at 152:8–14.  Further, Old Gate's rebuttal expert witness, Patrick Lemp, explained that, in evaluating a property's highest and best use, it was necessary to consider the legally permissible uses of the property.  Trial Tr. Day Three at 23:18–24.  Mr. Lemp also testified that, with respect to the Property at issue, it was presently zoned for commercial or industrial uses, thereby making residential use now legally not permitted.  Id. at 40:7–12.  Finally, the court understands, based on Mr. Henry's testimony, that the Property can be remediated to an industrial or commercial standard and still comply with the standards set by DEEP.  See Trial Tr. Afternoon Day One at 175:21–177:10.

On the basis of GZA's RAP and the expert testimony just summarized, the court concludes that it would be inequitable to require Paddock to pay for response costs incurred in connection with remediating the property to a residential standard.

IV.    CONCLUSION

The court declares that Paddock is responsible for 95% of response costs incurred in connection with remediating the property to an industrial or commercial standard, and Old Gate is responsible for 5% of response costs incurred in connection with remediating the property to the same standard.  With respect to the costs Old Gate

has already incurred, which total $207,600.88, Paddock is liable for $197,220.84, and Old Gate is liable for $10,380.04.

With respect to future costs, which both parties seek via declaratory judgments, the same allocation applies.  Thus, the court declares Paddock is liable for 95% of future response costs to remediate the property to an industrial or commercial standard, and Old Gate is responsible for 5% of future costs necessary to remediate the property to this standard.

The court directs the Clerk to enter judgment consistent with this ruling and close the case.


**SO ORDERED.**

Dated at New Haven, Connecticut this 9th day of September 2025.


 /s/ Janet C. Hall
Janet C. Hall
United States District Judge

38

## APPENDIX A

